# UNITED STATES *v.* MAINE et al.

No. 35, Orig.   Argued February 24–25, 1975—Decided March 17, 1975

*Solicitor General Bork* argued the cause for the United States.   With him on the brief were *Assistant Attorney General Johnson, Deputy Solicitor General Wallace, Keith A. Jones,* and *Bruce C. Rashkow.*

*Brice M. Clagett* argued the cause for defendants.   With him on the briefs for the Common Counsel States were *Michael Boudin, W. Laird Stabler, Jr.,* Attorney General, and *Charles Brandt,* Assistant Attorney General of Delaware, *Jon A. Lund,* Attorney General, and *Lee M. Schepps,* Assistant Attorney General of Maine, *Francis B. Burch,* Attorney General, and *Henry R. Lord,* Deputy Attorney General of Maryland, *Robert H. Quinn,* former Attorney General, *Francis X. Bellotti,* Attorney General,

and *Henry Herrmann,* Special Assistant Attorney General of Massachusetts, *Warren B. Rudman,* Attorney General, and *David H. Souter,* Deputy Attorney General of New Hampshire, *William F. Hyland,* Attorney General, and *Elias Abelson,* Assistant Attorney General of New Jersey, *Louis J. Lefkowitz,* Attorney General, and *Joseph T. Hopkins,* Assistant Attorney General of New York, *Richard J. Israel,* Attorney General, and *W. Slater Allen, Jr.,* Assistant Attorney General of Rhode Island, *Andrew P. Miller,* Attorney General, and *Gerald L. Baliles,* Deputy Attorney General of Virginia. On the brief for defendants the States of North Carolina et al. were *Rufus Edmisten,* Attorney General, and *Jean A. Benoy,* Deputy Attorney General of North Carolina, *Daniel R. McLeod,* Attorney General, and *Edward B. Latimer,* Assistant Attorney General of South Carolina, and *Arthur K. Bolton,* Attorney General, and *Alfred L. Evans, Jr.,* Assistant Attorney General of Georgia.\*

MR. JUSTICE WHITE delivered the opinion of the Court.

Seeking to invoke the jurisdiction of this Court under Art. III, § 2, of the Constitution and 28 U. S. C. § 1251 (b), the United States in April 1969 asked leave to file a complaint against the 13 States bordering on the Atlantic Ocean—Maine, New Hampshire, Massachusetts, Rhode Island, New York, New Jersey, Delaware, Maryland,

---

\*Briefs of *amici curiae* were filed by *William J. Guste, Jr.,* Attorney General of Louisiana, *Norman C. Gorsuch,* Attorney General of Alaska, *Slade Gorton,* Attorney General of Washington, *John L. Hill,* Attorney General of Texas, *Daniel R. McLeod,* Attorney General of South Carolina, *Andrew P. Miller,* Attorney General of Virginia, *Robert H. Quinn,* former Attorney General of Massachusetts, and *Evelle J. Younger,* Attorney General of California; and by *Frederick Moring* for the Associated Gas Distributors.

Virginia, North Carolina, South Carolina, Georgia, and Florida.[1] We granted leave to file, 395 U. S. 955, on June 16, 1969. The complaint asserted a separate cause of action against each of the States which alleged that:

> "[T]he United States is now entitled, to the exclusion of the defendant State, to exercise sovereign rights over the seabed and subsoil underlying the Atlantic Ocean, lying more than three geographical miles seaward from the ordinary low-water mark and from the outer limit of inland waters on the coast, extending seaward to the outer edge of the continental shelf, for the purpose of exploring the area and exploiting its natural resources."

It was further alleged that each of the States claimed some right or title to the relevant area and was interfering with the rights of the United States. It was therefore prayed that a decree be entered declaring the rights of the United States and that such further relief be awarded as might prove proper.[2]

The defendants answered, each generally denying proprietary rights of the United States in the seabed in the area beyond the three-mile marginal sea. Each of them, except Florida,[3] claimed for itself, as successor in title

---

[1] The State of Connecticut was not made a defendant, apparently because that State borders on Long Island Sound, which is considered inland water rather than open sea.

[2] The United States also demanded an accounting for all sums that the States may have derived from the area in question. This claim the Special Master recommends be denied for failure of proof. The United States does not except to this recommendation, and we approve it.

[3] The State of Florida claimed that by virtue of the Act of June 25, 1868, 15 Stat. 73, Congress had approved the maritime boundaries for that State which at certain places included more than three miles of the Atlantic Ocean and had thereby granted to the State all of the seabed within those boundaries. Florida also claimed in its answer

to certain grantees of the Crown of England (and in the case of New York, to the Crown of Holland), the exclusive right of dominion and control over the seabed underlying the Atlantic Ocean seaward from its coastline to the limits of the jurisdiction of the United States, asserting as well that any attempt by the United States to interfere with these rights would in itself violate the Constitution of the United States.[4]

Without acting on the motion for judgment filed by the United States that asserted that there was no material issue of fact to be resolved, we entered an order appointing the Honorable Albert B. Maris as Special Master and referred the case to him with authority to request further pleadings, to summon witnesses, and to take such evidence and submit such reports as he might deem appropriate. 398 U. S. 947 (1970). Before the Special Master, the United States contended that based on *United States* v. *California,* 332 U. S. 19 (1947), *United States* v. *Louisiana,* 339 U. S. 699 (1950), and *United States* v. *Texas,* 339 U. S. 707 (1950), it was entitled to judgment in accordance with its motion. The defendant States asserted that their cases were distinguishable from the prior cases and that in any event, *California, Louisiana,* and *Texas* were erroneously decided and should be

---

that the Florida Straits were not in the Atlantic Ocean as claimed by the United States but in the Gulf of Mexico. Subsequently, the controversy between the United States and Florida was severed and consolidated with the proceeding in No. 9, Original, which was then concerned with the seabed rights of the State of Florida in the Gulf of Mexico, 403 U. S. 949, 950 (1971). The consolidated proceedings were given a new number—No. 52, Original. We have acted on the Special Master's Report in that case. See *post,* p. 531.

[4] The States of Rhode Island, North Carolina, and Georgia each submitted an additional special defense applicable only to itself. We agree with the Special Master's rejection of these special defenses, and they will not be mentioned further.

overruled. They offered, and the Special Master received, voluminous documentary evidence to support their claims that, contrary to the Court's prior decisions, they acquired dominion over the offshore seabed prior to the adoption of the Constitution and at no time relinquished it to the United States. At the conclusion of the proceeding before him, the Special Master submitted a Report (hereinafter Report) which the United States supports in all respects, but to which the States have submitted extensive and detailed exceptions. The controversy is now before us on the Report, the exceptions to it, and the briefs and oral arguments of the parties.

In his Report, the Special Master concluded that the *California, Louisiana,* and *Texas* cases, which he deemed binding on him, governed this case and required that judgment be entered for the United States. Assuming, however, that those cases were open to re-examination, the Special Master went on independently to examine the legal and factual contentions of the States and concluded that they were without merit and that the Court's prior cases should be reaffirmed.

We fully agree with the Special Master that *California, Louisiana,* and *Texas* rule the issues before us. We also decline to overrule those cases as the defendant States request us to do.

*United States* v. *California, supra,* involved an original action brought in this Court by the United States seeking a decree declaring its paramount rights, to the exclusion of California, to the seabed underlying the Pacific Ocean and extending three miles from the coastline and from the seaward limits of the State's inland waters. California answered, claiming ownership of the disputed seabed. The basis of its claim, as the Court described it, was that the three-mile belt lay within the historic boundaries of the State; "that the original thirteen states acquired from

the Crown of England title to all lands within their boundaries under navigable waters, including a three-mile belt in adjacent seas; and that since California was admitted as a state on an 'equal footing' with the original states, California at that time became vested with title to all such lands." 332 U. S., at 23. The Court rejected California's claim. The original Colonies had not "separately acquired ownership to the three-mile belt or the soil under it, even if they did acquire elements of the sovereignty of the English Crown by their revolution against it." *Id.*, at 31. As the Court viewed our history, dominion over the marginal sea was first accomplished by the National Government rather than by the Colonies or by the States. Moreover, the Court went on to hold that the "protection and control of [the marginal sea] has been and is a function of national external sovereignty," *id.*, at 34, and that in our constitutional system paramount rights over the ocean waters and their seabed were vested in the Federal Government.

The United States later brought actions to confirm its title to the seabed adjacent to the coastline of other States. *United States* v. *Louisiana, supra,* was one of them. There Louisiana claimed title to the seabed under waters extending 27 miles into the Gulf of Mexico, the basis of the claim being that before and since the time of its admission to the Union, Louisiana had exercised dominion over the ocean area in question and that its legislature had formally included the 27-mile belt within the boundaries of the State. The Court gave judgment for the United States, holding that *United States* v. *California* was controlling and emphasizing that paramount rights in the marginal sea and seabed were incidents of national sovereignty:

"As we pointed out in *United States* v. *California,* the issue in this class of litigation does not turn on

title or ownership in the conventional sense. California, like the thirteen original colonies, never acquired ownership in the marginal sea. The claim to our three-mile belt was first asserted by the national government. Protection and control of the area are indeed functions of national external sovereignty. 332 U. S. pp. 31–34. The marginal sea is a national, not a state concern. National interests, national responsibilities, national concerns are involved. The problems of commerce, national defense, relations with other powers, war and peace focus there. National rights must therefore be paramount in that area." 339 U. S., at 704.

Louisiana had "no stronger claim to ownership of the marginal sea than the original thirteen colonies or California had," *id.*, at 705; and its claim, like theirs, gave way to the overriding rule that "the three-mile belt is in the domain of the Nation rather than that of the separate States," *ibid.* *A fortiori*, the waters and seabed beyond that limit were governed by the same rule.

In a companion case, *United States* v. *Texas, supra,* the Court again reaffirmed the holding and rationale of *United States* v. *California* and again rejected the claims of the State based on its historic boundaries at the time of the State's admission to the Union:

"If the property, whatever it may be, lies seaward of low-water mark, its use, disposition, management, and control involve national interests and national responsibilities. That is the source of national rights in it. Such is the rationale of the *California* decision which we have applied to Louisiana's case. The same result must be reached here if 'equal footing' with the various States is to be achieved. Unless any claim or title which the Republic of Texas had

to the marginal sea is subordinated to this full paramount power of the United States on admission, there is or may be in practical effect a subtraction in favor of Texas from the national sovereignty of the United States. Yet neither the original thirteen States (*United States* v. *California, supra,* pp. 31–32) nor California nor Louisiana enjoys such an advantage." 339 U. S., at 719.

The Special Master was correct in concluding that these cases, unless they are to be overruled, completely dispose of the States' claims of ownership here. These decisions considered and expressly rejected the assertion that the original States were entitled to the seabed under the three-mile marginal sea. They also held that under our constitutional arrangement paramount rights to the lands underlying the marginal sea are an incident to national sovereignty and that their control and disposition in the first instance are the business of the Federal Government rather than the States.

The States seriously contend that the prior cases, as well as the Special Master, were in error in denying that the original Colonies had substantial rights in the seabed prior to independence, and afterwards, by grant from or succession to the sovereignty of the Crown. Given the dual basis of the *California* decision, however, and of those that followed it, the States' claims of ownership prior to the adoption of the Constitution are not dispositive. Whatever interest the States might have had immediately prior to statehood, the Special Master was correct in reading the Court's cases to hold that as a matter of "purely legal principle . . . the Constitution . . . allotted to the federal government jurisdiction over foreign commerce, foreign affairs and national defense" and that "it necessarily follows, as a matter of constitutional law, that as attributes of these external sovereign powers

the federal government has paramount rights in the marginal sea." Report 23.

*United States* v. *Texas* unmistakably declares this constitutional proposition. There, Texas claimed that prior to joining the Union, it was an independent sovereign with boundaries extending a substantial distance in the Gulf of Mexico—boundaries which Congress had allegedly recognized when Texas was admitted to the Union. In deciding against the State, the Court did not reject the prestatehood rights of Texas as it had the rights of the 13 Original States in the *California* case. On the contrary, the Court was quite willing to "assume that as a Republic she had not only full sovereignty over the marginal sea but ownership of it, of the land underlying it, and of all the riches which it held. In other words, we assume that it then had *dominium* and *imperium* in and over this belt which the United States now claims." 339 U. S., at 717. Such prior ownership nevertheless did not survive becoming a member of the Union:

> "When Texas came into the Union, she ceased to be an independent nation. She then became a sister State on an 'equal footing' with all the other States. That act concededly entailed a relinquishment of some of her sovereignty. The United States then took her place as respects foreign commerce, the waging of war, the making of treaties, defense of the shores, and the like. In external affairs the United States became the sole and exclusive spokesman for the Nation. We hold that as an incident to the transfer of that sovereignty any claim that Texas may have had to the marginal sea was relinquished to the United States." *Id.*, at 717–718.

The Court stood squarely on the *California* and *Louisiana* cases for this conclusion; and in our view, the Special Master correctly read these authorities, unless they were

to be overruled in all respects, as foreclosing the present efforts of the States to demonstrate error in the Court's understanding of history in the *California* case.

Assuming the possibility, however, that the Court might re-examine the constitutional premise of *California* and similar cases, the Special Master proceeded, with admirable diligence and lucidity, to address the historical evidence presented by the States aimed primarily at establishing that the Colonies had legitimate claims to the marginal sea prior to independence and statehood and that the new States never surrendered these rights to the Federal Government. The Special Master's ultimate conclusion was that the Court's view of our history expressed in the *California* case was essentially correct and that if prior cases were open to re-examination, they should be reaffirmed in all respects.

We need not retrace the Special Master's analysis of historical evidence, for we are firmly convinced that we should not undertake to re-examine the constitutional underpinnings of the *California* case and of those cases which followed and explicated the rule that paramount rights to the offshore seabed inhere in the Federal Government as an incident of national sovereignty. That premise, as we have indicated, has been repeated time and again in the cases. It is also our view, contrary to the contentions of the States, that the premise was embraced rather than repudiated by Congress in the Submerged Lands Act of 1953, 67 Stat. 29, 43 U. S. C. § 1301. In that legislation, it is true, Congress transferred to the States the rights to the seabed underlying the marginal sea; however, this transfer was in no wise inconsistent with paramount national power but was merely an exercise of that authority. As the Special Master said, the Court in its prior cases "did not indicate that the federal government by Act of Congress

might not, as it did by the subsequently enacted Submerged Lands Act, grant to the riparian states rights to the resources of the federal area, subject to the reservation by the federal government of its rights and powers of regulation and control for purposes of commerce, navigation, national defense, and international affairs." Report 16. The question before the Court in the *California* case was "whether the state or the Federal Government has the paramount right and power to determine in the first instance when, how, and by what agencies, foreign or domestic, the oil and other resources of the soil of the marginal sea, known or hereafter discovered, may be exploited." 332 U. S., at 29. The decision there was that the National Government had the power at issue, the Court declining to speculate that "Congress, which has constitutional control over Government property, will execute its powers in such a way as to bring about injustices to states, their subdivisions, or persons acting pursuant to their permission." *Id.*, at 40.

The Submerged Lands Act did indeed grant to the States dominion over the offshore seabed within the limits defined in the Act and released the States from any liability to account for any prior income received from state leases that had been granted with respect to the marginal sea.[5] But in further exercise of paramount national authority, the Act expressly declared that nothing in the Act

"shall be deemed to affect in any wise the rights of the United States to the natural resources of that portion of the subsoil and seabed of the Continental Shelf lying seaward and outside of [the marginal sea], all of which natural resources appertain to the

---

[5] The Submerged Lands Act was held constitutional in *Alabama* v. *Texas*, 347 U. S. 272 (1954).

United States, and the jurisdiction and control of which by the United States is confirmed." 43 U. S. C. § 1302.

This declaration by Congress is squarely at odds with the assertions of the States in the present case. So, too, is the provision of the Act by which the grant to the States is expressly limited to the seabed within three miles (or three marine leagues in some cases) of the coastline, whether or not the States' historic boundaries might extend farther into the ocean. § 1301 (b). Moreover, in the course of litigation dealing with the reach and impact of the Act, the Court has said as plainly as may be that "the Act concededly did not impair the validity of the *California, Louisiana,* and *Texas* cases, which are admittedly applicable to all coastal States . . . ." *United States* v. *Louisiana,* 363 U. S. 1, 7 (1960); see also *id.,* at 83 n. 140. We agree with the Special Master when he said: "It is quite obvious that Congress could reserve to the federal government all the rights to the seabed of the continental shelf beyond the three-mile territorial belt of sea (or three leagues in the case of certain Gulf states) only upon the basis that it already had the paramount right to that seabed under the rule laid down in the *California* case." Report 19.

Congress emphatically implemented its view that the United States has paramount rights to the seabed beyond the three-mile limit when a few months later it enacted the Outer Continental Shelf Lands Act of 1953, 67 Stat. 462, 43 U. S. C. § 1331 *et seq.* Section 3 of the Act

"declared [it] to be the policy of the United States that the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition

as provided in this subchapter." 43 U. S. C. § 1332 (a).

The Act then proceeds to set out detailed provisions for the exercise of exclusive jurisdiction in the area and for the leasing and development of the resources of the seabed.

Of course, the defendant States were not parties to *United States* v. *California* or to the relevant decisions, and they are not precluded by res judicata from litigating the issues decided by those cases. But the doctrine of *stare decisis* is still a powerful force in our jurisprudence; and although on occasion the Court has declared—and acted accordingly—that constitutional decisions are open to re-examination, we are convinced that the doctrine has peculiar force and relevance in the present context. It is apparent that in the almost 30 years since *California*, a great deal of public and private business has been transacted in accordance with those decisions and in accordance with major legislation enacted by Congress, a principal purpose of which was to resolve the "interminable litigation" arising over the controversy of the ownership of the lands underlying the marginal sea. See H. R. Rep. No. 215, 83d Cong., 1st Sess., 2 (1953). Both the Submerged Lands Act and the Outer Continental Shelf Lands Act which soon followed proceeded from the premises established by prior Court decisions and provided for the orderly development of offshore resources. Since 1953, when this legislation was enacted, 33 lease sales have been held, in which 1,940 leases, embracing over eight million acres, have been issued. The Outer Continental Shelf, since 1953, has yielded over three billion barrels of oil, 19 trillion m.c.f. of natural gas, 13 million long tons of sulfur, and over four million long tons of salt.[6] In 1973 alone, 1,081,000 barrels of oil

---

[6] S. Rep. No. 93–1140, p. 4 (1974).

and 8.9 billion cubic feet of natural gas were extracted daily from the Outer Continental Shelf.[7] Exploitation of our resources offshore implicates a broad range of federal legislation, ranging from the Longshoremen's and Harbor Workers' Compensation Act, incorporated into the Outer Continental Shelf Lands Act, to the more recent Coastal Zone Management Act.[8] We are quite sure that it would be inappropriate to disturb our prior cases, major legislation, and many years of commercial activity[9] by calling into question, at this date, the constitutional premise of prior decisions. We add only that the Atlantic States, by virtue of the *California, Louisiana,* and *Texas* cases, as well as by reason of the Submerged Lands Act, have been on notice of the substantial body of authoritative law, both constitutional and statutory, which is squarely at odds with their claims to the seabed beyond the three-mile marginal sea. Neither the States nor their putative lessees have been in the slightest misled. Judgment shall be entered for the United States.

*So ordered.*

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

---

[7] *Id.,* at 5.

[8] 86 Stat. 1280, 16 U. S. C. § 1451 *et seq.* (1970 ed., Supp. II). For a summary of legislation affecting the Outer Continental Shelf, see Outer Continental Shelf Oil and Gas Development and the Coastal Zone, Senate Committee on Commerce, 93d Cong., 2d Sess., 55–58 (Comm. Print 1974).

[9] We have long held that the doctrine of *stare decisis* carries particular force where the effect of re-examination of a prior rule would be to overturn long-accepted commercial practice. See, *e. g.,* *M'Gruder* v. *Bank of Washington,* 9 Wheat. 598, 602 (1824); *Rock Spring Distilling Co.* v. *W. A. Gaines & Co.,* 246 U. S. 312, 320 (1918).