# United States Court of Appeals

## For the First Circuit

No. 03-2323

TEN TAXPAYER CITIZENS GROUP; CAPE COD MARINE TRADES ASSOCIATION,
INC.; RAOUL D. ROSS; THE MASSACHUSETTS BOATING AND YACHT CLUBS
ASSOCIATION, INC.,

Plaintiffs, Appellants,

v.

CAPE WIND ASSOCIATES, LLC,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
and Lynch, Circuit Judge.

John W. Spillane, with whom Spillane & Spillane, LLP was on
brief, for appellants.

Kurt W. Hague, with whom Timothy J. Dacey and Goulston &
Storrs, P.C. were on brief, for appellee.

June 28, 2004

**LYNCH**, **Circuit Judge**.  This appeal is an early round in the legal battle over whether a commercial wind energy farm may be built in Nantucket Sound.

In October 2002, Ten Taxpayer Citizens Group and several additional plaintiffs (together, Ten Taxpayer) filed a lawsuit in Massachusetts state court to prevent Cape Wind Associates from erecting a 197-foot data collection tower in Nantucket Sound.  The complaint alleged that Massachusetts state courts had jurisdiction over the project and that Cape Wind had failed to obtain the necessary permits under state law.  Cape Wind removed the action to federal court and Ten Taxpayer moved to remand.  After denying the motion to remand, the district court dismissed the complaint on August 19, 2003.

On appeal, Ten Taxpayer argues that the district court was obligated to remand the case to state court for lack of federal subject-matter jurisdiction.  Ten Taxpayer also challenges the court's dismissal of the complaint.  We affirm.

**I.**

The facts underlying this case are essentially undisputed.  Where the parties disagree, we accept as true the well-pleaded factual allegations in the plaintiffs' complaint, drawing all reasonable inferences in their favor.  Soto-Negron v. Taber Partners I, 339 F.3d 35, 38 (1st Cir. 2003).

Cape Wind is a limited liability corporation based in South Yarmouth, Massachusetts. Its goal is to construct a commercial windmill farm on Horseshoe Shoals, a shallow area of Nantucket Sound more than three miles offshore. The proposed windmill farm includes at least 130 industrial wind turbines, each 470 feet tall. If it is completed as presently envisioned, the facility will spread across 28 square miles of Nantucket Sound and will be visible from shore. The project is the first of its kind in North America.

To construct the wind farm, Cape Wind needs extensive meteorological and oceanographic data concerning conditions on Horseshoe Shoals. For that purpose, Cape Wind in late 2001 announced plans to build a "scientific measurement device station" (SMDS) on Horseshoe Shoals. Intended as a temporary facility, the SMDS was designed to collect data for five years. It would consist of a data tower rising approximately 200 feet in the air, supported by three steel pilings driven 100 feet into the seabed. Together with its tripodal support structure, the tower would occupy about 900 square feet of ocean surface.

On August 19, 2002, the United States Army Corps of Engineers issued a permit to Cape Wind under § 10 of the Rivers and Harbors Act of 1899, 33 U.S.C. § 401 et seq., for construction of

the SMDS.[1]  Cape Wind neither sought nor obtained permits for the SMDS project under Massachusetts law.  A few weeks later, the Coast Guard issued a public notice that construction of the data tower would commence on or about October 11, 2002.  Construction was briefly delayed when Ten Taxpayer obtained a temporary restraining order from a state court in a related lawsuit.  Ten Taxpayer voluntarily dismissed that suit, however, and the temporary restraining order lapsed by its own terms.  On October 27, 2002, Cape Wind began construction of the SMDS.  It is now complete and in operation.[2]

Ten Taxpayer filed this action in Barnstable Superior Court on October 16, 2002, shortly before construction of the data tower began.  In its complaint, Ten Taxpayer acknowledged that the SMDS site is more than three miles from the nearest Massachusetts shoreline and that, accordingly, the location falls under the jurisdiction of the federal government.  Nevertheless, Ten Taxpayer contended, Cape Wind could not build the SMDS without regulatory approval from Massachusetts because Congress has ceded to Massachusetts the power to regulate any activity affecting fishing in Nantucket Sound.  Under the Massachusetts laws regulating

---

[1] We express no view concerning the validity of this permit, which is the subject of a separate appeal in this court.  See Alliance to Protect Nantucket Sound, Inc. v. U.S. Dep't of the Army, No. 03-2604 (1st Cir. docketed Nov. 24, 2003).

[2] See generally http://capewind.whgrp.com (last visited June 22, 2004) (reporting real-time data from the SMDS).

fisheries and fish habitats, administrative approval is required for structures erected on the seabed. Because Cape Wind did not obtain such approval, Ten Taxpayer alleged, the SMDS project was in violation of Massachusetts law. Ten Taxpayer sought an injunction blocking construction of the SMDS or, if the court would not enjoin construction, a $25,000 fine for every day that the SMDS remained on Horseshoe Shoals.

Cape Wind immediately removed the case to federal court, asserting that federal jurisdiction was proper because Ten Taxpayer's complaint, on its face, states a federal question -- i.e., whether Congress has in fact delegated to Massachusetts the necessary regulatory authority over Nantucket Sound. In the alternative, Cape Wind argued that regardless of what Ten Taxpayer actually pleaded in its complaint, deciding Ten Taxpayer's state claims would require resolution of a substantial question of federal law, cf. Almond v. Capital Props., Inc., 212 F.3d 20, 23 (1st Cir. 2000) (describing so-called Smith jurisdiction), and that federal law completely preempts state law beyond three miles from the coast, cf. Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6-7 (2003) (describing the "complete preemption" doctrine). Ten Taxpayer moved to remand.

On November 14, 2002, the district court denied the motion to remand without opinion. Ten Taxpayer appealed that

order, but this court dismissed the appeal on the ground that it was not a final judgment.

Meanwhile, on November 6, 2002, Cape Wind filed a motion in federal court to dismiss Ten Taxpayer's complaint. Cape Wind attached to its motion two letters from the Massachusetts Department of Environmental Management indicating that, at least under Mass. Gen. Laws ch. 132A, Massachusetts does not claim regulatory authority over activities on Horseshoe Shoals. Cape Wind also argued that Ten Taxpayer lacks standing to assert the Commonwealth's regulatory interest in offshore lands.

On August 19, 2003, the district court granted Cape Wind's motion to dismiss. Ten Taxpayers Citizen Group v. Cape Wind Assocs., LLC, 278 F. Supp. 2d 98, 101 (D. Mass. 2003). The court concluded that although Congress did delegate to Massachusetts the power to regulate fishing in Nantucket Sound, that grant did not confer on the Commonwealth a general warrant to "polic[e] the entire Nantucket Sound for environmental disturbances that could impact fishing." Id. Massachusetts had no authority over the construction of the SMDS, and thus no state permits were required. Id.

Ten Taxpayer filed this timely appeal.

**II.**

This case implicates the complex and rather obscure body of law that divides regulatory authority over Nantucket Sound

-6-

between the state and federal governments.  Because that body of law is essential to our disposition of this appeal, we summarize it briefly.

## A. Regulation of the Seabed and Attached Structures

As a general rule, "paramount rights to the offshore seabed inhere in the Federal Government as an incident of national sovereignty." United States v. Maine (Maine I), 420 U.S. 515, 524 (1975).  In a series of cases beginning in 1947, the Supreme Court established that the United States enjoys exclusive title in the lands underlying the sea, regardless of a state's historical claims to the waters off its coast.  See United States v. Texas, 339 U.S. 707, 719-20 (1950); United States v. Louisiana, 339 U.S. 699, 705-06 (1950); United States v. California, 332 U.S. 19, 29-39 (1947).  Together, those cases established that the "control and disposition" of the seabed is "the business of the Federal Government rather than the States."  Maine I, 420 U.S. at 522.

That background rule, however, has been modified by Congress in several significant respects.  Most importantly, Congress in 1953 passed the Submerged Lands Act (SLA), 43 U.S.C. § 1301 et seq., which grants to the states full title to the seabed within three geographical miles of their shores.[3]  See 43 U.S.C. §§ 1301, 1311.  Moreover, Congress expressly recognized that three-

_____

[3] The three-mile boundary is subject to certain exceptions not relevant here.  E.g., 43 U.S.C. § 1301(b).

-7-

mile line as the official seaward boundary of the coastal states. Id. § 1312.

Shortly thereafter, however, Congress enacted the Outer Continental Shelf Lands Act of 1953 (OCSLA), 43 U.S.C. § 1331 et seq. A major purpose of the OCSLA was to specify that federal law governs on the "outer Continental Shelf" -- defined as all submerged lands under U.S. sovereign control lying seaward of the three-mile boundary, see 43 U.S.C. § 1331(a) -- and on any fixed structures attached to the outer Continental Shelf. Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 355 (1969); see also 43 U.S.C. § 1332 (declaring it to be "the policy of the United States that . . . the subsoil and seabed of the outer Continental Shelf appertain to the United States and are subject to its jurisdiction, control, and power of disposition"). The OCSLA makes the Constitution, laws, and civil and political jurisdiction of the United States fully applicable to the outer Continental Shelf. 43 U.S.C. § 1333(a)(1). It also establishes nationwide rules for the leasing and development of natural resources in the seabed outside of state territory. Id. § 1337. Further, the OCSLA provides a federal cause of action for any person aggrieved by a violation of those rules, id. § 1349(a)(1), and grants the federal district courts jurisdiction to hear such cases, id. § 1349(b). It is, in short, a sweeping assertion of federal supremacy over the submerged lands outside of the three-mile SLA boundary. See id. § 1332

-8-

(declaring it to be "the policy of the United States that . . . the outer Continental Shelf is a vital <u>national</u> resource reserve held by the <u>Federal</u> Government for the public" (emphasis added)).

In 1975, the Supreme Court confirmed this broad understanding of the OCSLA in <u>Maine I</u>. The United States had brought an original complaint in the Supreme Court against thirteen states bordering the Atlantic Ocean, alleging that each state had claimed some right or title in the outer Continental Shelf that was inconsistent with federal interests. 420 U.S. at 516-17. In reply, the defendant states (including Massachusetts) had denied the United States's title in the outer Continental Shelf, asserted a variety of historical claims to the seabed beyond the SLA's three-mile boundary, and urged the Court to overrule its decisions in <u>California</u>, <u>Louisiana</u> and <u>Texas</u>. <u>Id.</u> at 517-19. The Supreme Court ruled for the United States, reaffirming that "paramount rights" in the seabed belong to the federal government as national sovereign. <u>Id.</u> at 524. The SLA, the Court acknowledged, had transferred title to the states in a narrow band of the seabed. But that statute did not alter the federal government's rights outside of that narrow band. <u>Id.</u> at 526. On the contrary, the Court explained, Congress in the OCSLA had "emphatically implemented its view that the United States has paramount rights to the seabed beyond the three-mile limit." <u>Id.</u>

**B. Regulation of Fishing and Marine Fisheries**

With the framework for regulating the seabed thus settled, Congress in 1976 enacted the Magnuson (now Magnuson-Stevens) Fishery Conservation and Management Act, 16 U.S.C. § 1801 et seq.

Like the OCSLA, the Magnuson-Stevens Act asserts federal control over the waters outside of the three-mile limit of state jurisdiction. The Act creates a "national framework for conserving and managing marine fisheries." S. Rep. No. 104-276, at 2 (1996) (describing the history and purposes of the Act). It claims for the federal government "exclusive fishery management authority" in outer Continental Shelf waters within and beyond the United States's "exclusive economic zone," which extends approximately 197 nautical miles seaward from the three-mile boundary of state jurisdiction.[4] See 16 U.S.C. § 1811. Within that exclusive economic zone, the Act further claims for the United States "sovereign rights . . . over all fish, and all Continental Shelf fishery resources."[5] Id. § 1811(a); see also id. § 1801(c)(1)

---

[4] The Magnuson-Stevens Act does not create this "exclusive economic zone," but rather incorporates by reference the 200-nautical mile exclusive economic zone that President Reagan created by executive order in 1983. See 16 U.S.C. § 1802(11); Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 14, 1983). Congress, however, modified that zone for purposes of the Magnuson-Stevens Act, defining it to include only that portion of the original exclusive economic zone that is seaward of the SLA boundary of state jurisdiction. See § 1802(11); Massachusetts ex rel Div. of Marine Fisheries v. Daley, 170 F.3d 23, 25 (1st Cir. 1999).

[5] There is an exception, not relevant in this case, for the regulation of "highly migratory" fish species. See 16 U.S.C.

-10-

(declaring Congress's intent "to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources").

At the same time, the Magnuson-Stevens Act establishes that the states enjoy the power to regulate fishing activities <u>within</u> their borders, including within the three-mile SLA boundary: "[N]othing in this chapter shall be construed as extending or diminishing the jurisdiction or authority of any State within its boundaries."[6]  16 U.S.C. § 1856(a)(1).  By so providing, Congress "confirmed state jurisdiction over fisheries within a State's internal waters and, for coastal states, out to the three-mile limit."  <u>Davrod Corp.</u> v. <u>Coates</u>, 971 F.2d 778, 786 (1st Cir. 1992); <u>see also</u> <u>Massachusetts ex rel Div. of Marine Fisheries</u> v. <u>Daley</u>, 170 F.3d 23, 25 (1st Cir. 1999) (Magnuson-Stevens Act, with limited exceptions, does not apply within state territorial waters).

## C.  Federal vs. State Jurisdiction in Nantucket Sound

Nantucket Sound, where the disputed tower has been built, presents special difficulties in distinguishing the respective spheres of state and federal jurisdiction.  Nantucket Sound is almost completely enclosed by Massachusetts's territorial sea; only

---

§ 1812.

[6] Once again, there are certain exceptions not relevant in the present case.  <u>E.g.</u>, 16 U.S.C. § 1856(b).

-11-

at the extreme eastern end of the Sound does a channel of federal water approximately one mile wide connect it to the open ocean. But the Sound is a large body of water, and its center portion -- including the site of Cape Wind's data tower on Horseshoe Shoals -- is more than three miles from any coast.

Despite that fact, Massachusetts in the early 1970s took the position that all of Nantucket Sound, including Horseshoe Shoals, is within Massachusetts's territorial jurisdiction under the doctrine of "ancient title." The Supreme Court rejected that claim in United States v. Maine (Maine II), 475 U.S. 89 (1986), holding that the Commonwealth did not inherit title to the Sound from the British Crown. Id. at 103. After Maine II, it is incontrovertible that Cape Wind's data tower is located on the outer Continental Shelf, outside of Massachusetts's territorial jurisdiction. 43 U.S.C. § 1331(a).

But there is a complication. In 1984 -- while the Maine II litigation was pending -- Congress passed a bill defining all of Nantucket Sound to be within the "jurisdiction and authority" of Massachusetts "[f]or the purposes of" the Magnuson-Stevens Act. See Pub. L. No. 98-623, § 404(4), 98 Stat. 3394, 3408 (Nov. 8, 1984) (codified at 16 U.S.C. § 1856(a)(2)(B)). In Davrod Corp. v. Coates, supra, this court held that § 1856(a)(2)(B) "expressly confirms" Massachusetts's power to regulate the length of fishing vessels in Nantucket Sound. See 971 F.2d at 786. In this case,

Ten Taxpayer contends that the same provision authorizes Massachusetts to regulate the construction of Cape Wind's data tower, which Ten Taxpayer claims has the potential to affect fishing and fish habitats.

**III.**

**A.  Removal**

With that background in mind, we turn to Ten Taxpayer's arguments on appeal.  The first question is whether the district court should have remanded this case to the Barnstable Superior Court for lack of federal subject-matter jurisdiction.[7] Our review is de novo.  Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n, 142 F.3d 26, 33 (1st Cir. 1998).

Removal is permitted under 28 U.S.C. § 1441 in civil actions over which the district courts have "original jurisdiction."  The Supreme Court has interpreted that requirement to bar removal unless the state action could have been filed in federal court in the first instance.  Sygenta Crop Protection, Inc.

_____

[7] Cape Wind also renews its argument that the plaintiffs lack standing to bring this suit.  We disagree.  A Massachusetts statute expressly allows groups like Ten Taxpayer to bring suit to enjoin environmental harms under any "statute, ordinance, by-law or regulation the major purpose of which is to prevent or minimize damage to the environment," Mass. Gen. Laws ch. 214, § 7A, and the plaintiffs here (all of whom reside in towns bordering Nantucket Sound and many of whom work in the Sound itself) allege sufficiently concrete and personal injuries from Cape Wind's activities to support standing.  In addition, no party has suggested that the appeal is moot because the SMDS has already been built; indeed, Ten Taxpayer says that Massachusetts regulatory clearance for the project remains both available and required.

v. Henson, 537 U.S. 28, 33 (2002); Okla. Tax Comm'n v. Graham, 489 U.S. 838, 840 (1989) (per curiam); see also BIW Deceived v. Local 56, 132 F.3d 824, 830 (1st Cir. 1997). Here, the most obvious bases for federal subject-matter jurisdiction are lacking: the parties are nondiverse, and Ten Taxpayer's complaint does not (at least on its face) assert a cause of action based on federal law.

The question, accordingly, is whether any of several alternative bases for subject-matter jurisdiction applies. We reject the primary argument for removal offered by Cape Wind, but find removal proper on a different ground.

1. Delegation of Regulatory Authority Under the Magnuson-Stevens Act

Cape Wind first relies on federal preemption under the Magnuson-Stevens Act. It argues that Ten Taxpayer's claims "arise under" federal law, and thus support removal under § 1441, because Ten Taxpayer cannot prevail without showing that Congress in fact granted to Massachusetts the authority to regulate on Horseshoe Shoals. This, Cape Wind argues, constitutes a "federal question" on the face of Ten Taxpayer's well-pleaded complaint under 28 U.S.C. § 1331.

We disagree. In this posture, the contention that federal law does not authorize Ten Taxpayer's claims is simply a federal preemption defense available to Cape Wind. It is hornbook law that a federal defense does not confer "arising under" jurisdiction, regardless whether that defense is anticipated in the

-14-

plaintiff's complaint. <u>Beneficial Nat'l Bank</u>, 539 U.S. at 6; <u>Louisville & Nashville R. Co.</u> v. <u>Mottley</u>, 211 U.S. 149, 152 (1908). That is generally true even where the asserted defense is the preemptive effect of a federal statute. <u>Franchise Tax Bd.</u> v. <u>Constr. Laborers Vacation Tr.</u>, 463 U.S. 1, 12 (1983) (well-pleaded complaint rule may bar removal even where the only question for decision is the viability of a federal preemption defense).

Cape Wind argues that the case at bar is distinguishable from an ordinary case involving a federal preemption defense because the question is not whether Congress <u>precluded</u> state regulation, but whether it affirmatively <u>permitted</u> it. The Supreme Court rejected that precise argument in <u>Gully</u> v. <u>First Nat'l Bank</u>, 299 U.S. 109 (1936). In <u>Gully</u>, a state tax collector sued to collect taxes from a national bank. <u>Id.</u> at 111. The bank tried to remove the case, arguing that if the state government had the power to collect taxes from a national bank, it enjoyed that power only to the extent conferred by federal statute. <u>Id.</u> at 112. Therefore, the bank argued, removal was proper because the state tax collector necessarily relied on federal law in bringing the suit. <u>Id.</u> The Supreme Court rejected that reasoning:

> The argument . . . proceeds on the assumption that, because permission is at times preliminary to action, the two are to be classed as one. But the assumption will not stand . . . . Here, the right to be established is one created by the state. If that is so, it is unimportant that federal consent is the source of state authority. To reach the underlying law we do not travel back so far. By unimpeachable authority, a suit brought

-15-

upon a state statute does not arise under an act of Congress or the Constitution of the United States because prohibited thereby. With no greater reason can it be said to arise thereunder because permitted thereby.

Id. at 116 (citations omitted). The same reasoning applies here. No matter how the argument is framed, Cape Wind's contention that Massachusetts has no power to regulate on Horseshoe Shoals does not support removal.

### 2. Federal Incorporation of State Law on the Outer Continental Shelf

For an entirely different reason, however, we hold that Ten Taxpayer's claims do arise under federal law. That is because Congress has explicitly incorporated state law on the outer Continental Shelf as federal law:

To the extent they are applicable and not inconsistent with this subchapter . . . , the civil and criminal laws of each adjacent State, now in effect or hereinafter adopted . . . are declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf . . . . All of such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States.

43 U.S.C. § 1333(a)(2) (emphasis added). Interpreting this provision, the Supreme Court has held that "federal law is 'exclusive' in its regulation of this area, and . . . state law is adopted only as surrogate federal law." Rodrigue, 395 U.S. at 357; see also Gulf Offshore Co. v. Mobil Oil Corp., 453 U.S. 473, 480 (1981) ("All law applicable to the Outer Continental Shelf is

-16-

federal law, but to fill the substantial 'gaps' in the coverage of federal law, OCSLA borrows the 'applicable and not inconsistent' laws of the adjacent States as surrogate federal law.").

The consequence for Ten Taxpayer's complaint is clear. The SMDS is a "fixed structure[] erected" on the "subsoil and seabed of the outer Continental Shelf" in territory adjacent to Massachusetts. As a result, the Massachusetts statutes and regulations at issue in this case are, by federal statute, treated as <u>federal</u> law to the extent that they apply on Horseshoe Shoals. See <u>Union Texas Petroleum Corp.</u> v. <u>PLT Engineering, Inc.</u>, 895 F.2d 1043, 1047 (5th Cir. 1990).

In its supplemental brief,[8] Ten Taxpayer opposes this interpretation of the OCSLA. It contends that § 1333(a)(2) merely specifies the rule of decision that should apply in cases brought under 43 U.S.C. § 1349(b)(1), the provision that grants the district courts subject-matter jurisdiction to hear cases arising from certain activities on the outer Continental Shelf. Moreover, Ten Taxpayer says, the OCSLA is predominantly concerned with oil and gas exploration on the outer Continental Shelf, and the Act's incorporation of state law must be understood in that context.

---

[8] At oral argument, the court invited the parties to file supplemental briefs directed to whether 43 U.S.C. § 1333(a)(2) supports federal subject-matter jurisdiction in this case. Both parties accepted the invitation.

-17-

These arguments are unfounded.  The text of § 1333(a)(2) is unequivocal:  on the seabed of the outer Continental Shelf and on any fixed structures attached thereto, the "civil and criminal laws of each adjacent State . . . are declared to be the law of the United States."  No reference is made to actions brought under § 1349(b)(1).  On the contrary, Congress's explicit reference to state criminal laws belies any suggestion that § 1333(a)(2) merely defines the rule of decision for civil actions brought under § 1349.  And Congress left no doubt that it expected the federal courts to have control over the administration of adopted state laws on the outer Continental Shelf.  See § 1333(a)(2) ("All such applicable laws shall be administered and enforced by the appropriate officers and courts of the United States.").

Likewise, nothing in § 1333(a)(2) limits the incorporation of state law to activities involved in exploring for oil and gas.[9]  Nor is there any reason to infer such a limitation, as Congress had good reason to adopt state law in its entirety (except where inconsistent with federal law).  Federal law is interstitial by its nature, and no other body of law applies on the outer Continental Shelf.  So rather than legislate for every conceivable circumstance that might arise, Congress simply incorporated state law, thereby simultaneously retaining federal

_____

[9] We express no view as to whether other provisions of the OCSLA are so limited.  That question is implicated in a related appeal pending before this court.  See supra note 1.

-18-

control over the outer Continental Shelf and ensuring that a comprehensive body of substantive law will be available to resolve disputes. See Gulf Offshore, 453 U.S. at 480; Chevron Oil Co. v. Huson, 404 U.S. 97, 103 (1971); Rodrigue, 395 U.S. at 357.

We hold that Ten Taxpayer's claims, though ostensibly premised on Massachusetts law, arise under the "law of the United States" under § 1333(a)(2). A federal question thus appears on the face of Ten Taxpayer's well-pleaded complaint. See 28 U.S.C. § 1331. Accordingly, the case was properly removed. Id. § 1441(b); see Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340, 351 (5th Cir. 1999) (allowing removal because the plaintiff's state statutory claim was incorporated as federal law under the OCSLA); Hodges v. Shell Oil Co., No. Civ. A. 97-1573, 1997 WL 473809, at *3-*5 (E.D. La. Aug. 19, 1997) (same).[10]

## B. Dismissal of Ten Taxpayer's Complaint

Having determined that the case was properly removed to federal court, we turn to the question whether the district court properly dismissed Ten Taxpayer's complaint under Fed. R. Civ. P. 12(b)(6). Once again, our review is de novo. Peña-Borrero v. Estremeda, 365 F.3d 7, 11 (1st Cir. 2004).

---

[10] Because we hold that Ten Taxpayer's claims arise directly under federal law, we do not decide whether the so-called Smith doctrine, see Smith v. Kansas City Title & Trust Co., 255 U.S. 180, 199 (1921), or the doctrine of complete preemption, see Beneficial Nat'l Bank v. Anderson, 539 U.S. 1, 6-7 (2003), would support federal jurisdiction in this case.

-19-

The district court dismissed the complaint on the ground that the Magnuson-Stevens Act did not grant to the Commonwealth sufficiently broad authority to regulate the construction of a tower in federal waters in Nantucket Sound. See Ten Taxpayers, 278 F. Supp. 2d at 100-01 ("Congress did not delegate its complete sovereign authority over the pocket of federal waters in Nantucket Sound to the Commonwealth, but only that part necessary to establish consistent fishing regulations throughout the Sound."). On appeal, the parties devote considerable attention to the same question. Ten Taxpayer says that by placing Nantucket Sound under the "jurisdiction and authority" of Massachusetts "for the purposes of" the Magnuson-Stevens Act, see 16 U.S.C. § 1856(a)(2), Congress must have intended to empower the Commonwealth to regulate activities on the seabed of Nantucket Sound that, like the SMDS, have the potential to affect fishing. Cape Wind responds, inter alia, that the "purposes" of the Magnuson-Stevens Act do not include regulation of structures attached to the seabed.

We frame the issue differently. Whatever Congress meant by its reference to "the purposes of" the Magnuson-Stevens Act in § 1856(a)(2),[11] the Massachusetts statutes at issue here are

---

[11] Congress may not have intended the phrase as a substantive restriction. Section 1856(a)(2) defines the term "jurisdiction and authority of a State." In that context, a natural interpretation of the phrase "[f]or the purposes of this chapter" is simply that Congress wanted the definition stated in § 1856(a)(2) to apply throughout the Magnuson-Stevens Act. Congress employed similar language in definitional clauses elsewhere in the Magnuson-Stevens

available on the outer Continental Shelf in any event as surrogate federal law, provided they are not inconsistent with other applicable federal law. 43 U.S.C. § 1333(a)(2). So the critical question for this court is not whether Congress gave Massachusetts the authority to regulate on Horseshoe Shoals. Rather, we must decide (1) whether the Massachusetts statutes in question apply, by their own terms, to activities on Horseshoe Shoals; and (2) if they do apply, whether their application to Cape Wind's construction of the SMDS would be inconsistent with federal law. We conclude that Ten Taxpayer's complaint falters on both grounds.

### 1. Scope of the Asserted Massachusetts Statutes

First, we are extremely doubtful that the Massachusetts statutes on which Ten Taxpayer relies apply to the SMDS site. Obviously, no permit was required for the SMDS if Massachusetts has not purported to regulate activities on that site. Ten Taxpayer asserts claims under three Massachusetts statutes: Mass. Gen. Laws chapters 91, 130, and 132A. On our reading of Massachusetts law, none of those statutes applies to the erection of a tower on Horseshoe Shoals.

In Count I of its complaint, Ten Taxpayer asserts that Cape Wind failed to comply with Mass. Gen. Laws ch. 130. Ten Taxpayer is correct that chapter 130, which regulates fishing and

Act. See, e.g., 16 U.S.C. § 1802(11); id. § 1821(e)(2)(A); id. § 1823(c)(2).

-21-

marine fisheries in Massachusetts, applies broadly to "all marine fisheries and fish within the jurisdiction of the commonwealth." Id. § 1. Ten Taxpayer's claim, however, arises under § 16, which is considerably more narrow: "Any occupation under this chapter of tide waters or any work done therein, shall be subject to the pertinent [permitting and licensing] provisions of chapter ninety-one."

Significantly, the term "tide waters" is not defined in chapter 130 or in the implementing regulations, and there are no published Massachusetts cases interpreting § 16. Ten Taxpayer argues that "tide waters" embraces all waters "subject to the rise and fall of the tides" -- a definition that, it says, includes Horseshoe Shoals, where Coast Guard records indicate that the sea depth varies by as much as three feet between high and low tides.

In our view, that interpretation is too broad. Massachusetts cases referring to "tide waters," "tidal waters," "tidewaters," and the like invariably concern developments in harbors or along the shoreline. See, e.g., Trio Algario, Inc. v. Comm'r of Dep't of Envtl. Prot., 795 N.E.2d 1148, 1151-53 (Mass. 2003) (discussing wharves and other occupations of "tide waters"); Boston Waterfront Dev. Corp. v. Massachusetts, 393 N.E.2d 356, 358 (Mass. 1979) (describing "the shores of the sea" as "tidal areas"); Comm'r of Pub. Works v. Cities Serv. Oil Co., 32 N.E.2d 277, 281 (Mass. 1941) (discussing the construction of piers and wharves as

-22-

the "erection of structures in tide waters"). At most, the term refers to the waters "belong[ing] to the Commonwealth." <u>Trio Algario</u>, 795 N.E.2d at 1153 n.9. Ten Taxpayer relies on the ancient case of <u>Commonwealth</u> v. <u>Vincent</u>, 108 Mass. 441 (1871), which opines that "tide waters" means "waters, whether salt or fresh, wherever the ebb and flow of the tide from the sea is felt." <u>Id.</u> at 447. On its facts, however, that case involved only the question whether a pond on the mainland qualified as "tide waters" by virtue of a narrow channel connecting it to the sea. Notwithstanding the broad dictum, we do not think <u>Vincent</u> supports Ten Taxpayer's sweeping notion that "tide waters" embraces <u>any</u> location where the depth of the sea is affected by the tides, even in waters that do not "belong" to the Commonwealth. We conclude that Mass. Gen. Laws ch. 130, § 16 is inapplicable to the SMDS site by its own terms.

In any event, even if § 16 were applicable on Horseshoe Shoals, we would still conclude that no permit was required. That is because § 16 merely subjects structures erected in the tide waters to the "pertinent provisions" of Mass. Gen. Laws ch. 91. Chapter 91 requires a license from the Massachusetts Department of Environmental Protection (DEP) for structures built in protected waters. <u>See</u> Mass. Regs. Code tit. 310, § 9.05(1)(a). The DEP's regulations, however, limit this licensing and permitting requirement to activities in "waterways" and "filled tidelands."

-23-

<u>Id.</u> § 9.04.  Neither of those terms, as defined in the regulations, embraces Horseshoe Shoals.[12]  Consequently, Cape Wind was not obligated to seek a permit for its data tower under Mass. Gen. Laws ch. 91.

Finally, Ten Taxpayer asserts in Count II of its complaint that Cape Wind was required to obtain approval for the SMDS under the Massachusetts Ocean Sanctuaries Act, Mass. Gen. Laws ch. 132A.  Chapter 132A expressly provides that Nantucket Sound is within the Cape and Islands Ocean Sanctuary.  <u>See</u> <u>id.</u> § 13(c). With few exceptions, the statute prohibits "the building of any structure on the seabed" in any ocean sanctuary.  <u>Id.</u> § 15.  From this, Ten Taxpayer concludes that Cape Wind erected the SMDS in violation of chapter 132A.

The problem with this theory is that the Massachusetts Department of Environmental Management (DEM), which is charged with implementing the Ocean Sanctuaries Act, <u>id.</u> § 12C, including the "care, oversight and control" of ocean sanctuaries, <u>id.</u> § 14; Mass. Regs. Code tit. 302, § 5.09, has expressly <u>disclaimed</u> authority

_____

[12] Under DEP regulations, "waterway" means "any area of water and associated submerged land or tidal flat lying below the high water mark of any navigable river or stream, any Great Pond, or any portion of the Atlantic Ocean <u>within the Commonwealth</u>."  Mass. Regs. Code tit. 310, § 9.02 (emphasis added).  Horseshoe Shoals is not "within the Commonwealth" under the SLA, and nothing in the Magnuson-Stevens Act alters that fact.  Similarly, the SMDS is not located on "filled tidelands," which are defined as "former submerged lands and tidal flats which are no longer subject to tidal action due to the presence of fill."  <u>Id.</u>

-24-

over Horseshoe Shoals. In a letter to counsel for Ten Taxpayer dated January 24, 2002, Myron Gildesgame, the DEM's director of the Office of Water Resources and the agency's official Ocean Sanctuaries Coordinator,[13] explained that the Cape and Islands Ocean Sanctuary is <u>not</u> considered to include the Horseshoe Shoals area. Although chapter 132A purports to include Nantucket Sound in that sanctuary, that legislation was passed prior to the Supreme Court's decision in <u>Maine II</u>. Now, he concluded, "jurisdiction over the central portion of the Sound, including Horseshoe Shoals, is with the federal government." Gildesgame was even more explicit in response to a subsequent letter from Ten Taxpayer:

> While I appreciate your legal research . . . relative to state jurisdiction claims, the Department and the Ocean Sanctuaries Program have not claimed jurisdiction over the area of the sound which includes Horseshoe Shoals, and respectfully decline to seek to expand our current jurisdiction.

That is the end of the matter. Because the responsible Massachusetts agency has disclaimed regulatory authority over the

---

[13] The Ocean Sanctuaries Coordinator is a position created under the DEM's regulations. <u>See</u> Mass. Regs. Code tit. 302, § 5.09(3). The Coordinator is charged with carrying out the responsibilities of the DEM under the Ocean Sanctuaries Act and is authorized to perform or order investigations to determine whether particular activities are consistent with chapter 132A. <u>Id.</u>

SMDS site,[14] we hold that Cape Wind was not required to seek approval for the project under Mass. Gen. Laws. ch. 132A.

### 2. Inconsistency with Federal Law

There is a second reason why the district court was correct to dismiss Ten Taxpayer's complaint. Even if our interpretation of state law is incorrect and one or more of the cited Massachusetts statutes does require a permit for the SMDS, there is a further question: whether that requirement should be incorporated and enforced as federal law under 43 U.S.C. § 1333(a)(2)(A). We conclude that it should not.

Under § 1333(a)(2)(A), the Massachusetts statutes cited by Ten Taxpayer apply on the outer Continental Shelf, if at all, solely as surrogate federal law. Id.; see also Gulf Offshore, 453 U.S. at 480 ("All law applicable to the Outer Continental Shelf is federal law . . . ."). But under the OCSLA, state laws are not

_____

[14] We recognize that under DEM regulations, it is the Commissioner of the DEM and not the Ocean Sanctuaries Coordinator who is formally empowered to make determinations regarding the applicability of permit requirements to particular situations. See Mass. Regs. Code tit. 302, § 5.09(4). Nevertheless, we are satisfied that Gildesgame's letters to counsel for Ten Taxpayer represent the official position of the DEM concerning the Commonwealth's jurisdiction over Horseshoe Shoals. Ten Taxpayer has not disputed that the letters represent the agency's position. Moreover, prior to filing the instant lawsuit, Ten Taxpayer notified both the Commissioner of the DEM and the Massachusetts Attorney General of its intent to sue. See Mass. Gen. Laws ch. 214, § 7A (requiring such notice). Despite this notice, neither the Commissioner nor the Attorney General sought to intervene in this action or initiate an enforcement proceeding against Cape Wind.

adopted as surrogate federal law to the extent that they are "inconsistent with [the OCSLA] or with other Federal laws . . . ." Id.; see also Rodrigue, 395 U.S. at 355-56 (explaining that state law applies to fixed structures on the outer Continental Shelf "only as federal law and then only when not inconsistent with applicable federal law").

In our view, the OCSLA leaves no room for states to require licenses or permits for the erection of structures on the seabed on the outer Continental Shelf. Congress retained for the federal government the exclusive power to authorize or prohibit specific uses of the seabed beyond three miles from shore. See § 1333(a)(3) ("The provisions of this section for adoption of State law as the law of the United States shall never be interpreted as a basis for claiming any interest in or jurisdiction on behalf of any State for any purpose over the seabed and subsoil of the outer Continental Shelf . . . ."). If adopted and enforced on the outer Continental Shelf, statutes like Mass. Gen. Laws chs. 91 and 132A, which require the approval of state agencies prior to construction, would effectively grant state governments a veto power over the disposition of the national seabed. That result is fundamentally inconsistent with the OCSLA. See id. § 1332(3) (declaring it to be the policy of the United States that "the outer Continental Shelf is a vital national reserve held by the Federal Government for the public, which should be made available for expeditious and orderly

development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs" (emphasis added)).

Ten Taxpayer contends that the Magnuson-Stevens Act, which was enacted after the OCSLA, changed this calculus by defining the "body of water commonly known as Nantucket Sound" to be within the "jurisdiction and authority" of Massachusetts. See 16 U.S.C. § 1856(a)(2)(B). Yet nothing in the Magnuson-Stevens Act purports to repeal or amend the OCSLA. Cf. Passamaquoddy Tribe v. Maine, 75 F.3d 784, 790 (1st Cir. 1996) (implied repeal of federal statutes is disfavored). On the contrary, the two statutes can readily coexist: the Magnuson-Stevens Act authorizes Massachusetts to regulate fishing-related conduct throughout Nantucket Sound, but "the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon," 43 U.S.C. § 1333(a)(2)(A), remain the exclusive province of the federal government. Congress was perfectly clear in the Magnuson-Stevens Act that it did not intend to alter the rights of the United States in the outer Continental Shelf. See 16 U.S.C. § 1801(c)(1) (declaring it to be the policy of Congress in the Magnuson-Stevens Act "to maintain without change the existing territorial or other ocean jurisdiction of the United States for all purposes other than the conservation and management of fishery resources").

We conclude that any Massachusetts permit requirement that might apply to the SMDS project is inconsistent with federal law and thus inapplicable on Horseshoe Shoals under the OCSLA. The district court did not err in dismissing Ten Taxpayer's complaint.

**IV.**

The judgment of the district court is **<u>affirmed</u>**. Costs are awarded to Cape Wind.