556 P.2d 929 (1976)
STATE of Alaska, Appellant,
v.
Walter K. SIEMINSKI, Appellee.
No. 2544.
Supreme Court of Alaska.
November 26, 1976.
Gerald W. Markham, Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellant.
*930 Raymond A. Nesbett, Anchorage, for appellee.[1]
Before BOOCHEVER, C.J., and RABINOWITZ, CONNOR, ERWIN and BURKE, JJ.

OPINION
RABINOWITZ, Justice.
In the summer of 1973 a criminal complaint was filed against appellee, Walter K. Sieminski, alleging that on June 7, 1973, Sieminski had fished for and taken scallops nine miles offshore at Sitkilidak Island, in the waters generally southeast of Kodiak Island. The complaint charged that this fishing violated AS 16.05.920(a) and 5 AAC 18.710(g)(2). At the time, AS 16.05.920(a) provided:
Unless permitted by this chapter or by regulation made under this chapter, it is unlawful for a person to take, possess, offer to purchase fish, game or marine aquatic plants, or any part of fish, game or aquatic plans, or a nest of egg of fish or game.
The cited regulation, 5 AAC 18.710(g) (2), provided:
(g) Scallops may be taken
......
(2) from July 15 through March 31 in Pacific Ocean waters south of the latitude of Cape Chiniak light and waters north and east of Black Point, excluding those waters northwest of a line from Cape Barnabas to Narrow Cape.
Sieminski was subsequently brought to trial on the charge in the district court at Kodiak. At the outset of the trial the State moved to strike the citation of 5 AAC 18.710(g) (2) from the complaint, conceding that the alleged fishing violation occurred in waters outside the area encompassed by the regulation. Over the objection of counsel for Sieminski, the motion was granted and the State's case was reduced to a charge that Sieminski had violated AS 16.05.920(a). Upon Sieminski's ultimate conviction after trial, the district judge imposed the maximum allowable fine, $1,000.
Sieminski appealed his conviction to the superior court. He confined his appeal to two specifications of error. The first was that the statutory provision upon which the conviction rested did not apply to conduct occurring beyond the territorial limit of three miles from the Alaskan coast. This specification raised a question of interpretation of the state statute. The other contention was that any attempt by the State to regulate fishing beyond territorial waters violated the supremacy clause of the federal constitution because the federal government had assumed exclusive jurisdiction over ocean resources beyond the three mile limit. Sieminski relied specifically upon the terms of the Outer Continental Shelf Lands Act of 1953, 43 U.S.C. §§ 1331-43 (1970), raising an issue of federal statutory interpretation.
The superior court set aside the conviction and ordered a judgment of acquittal be entered. The superior court's decision was announced in a single sentence:
Based upon Severin Hjelle, et al. v. James W. Brooks, Commissioner of Fish and Game for the State of Alaska, et al., 377 Fed.Supp. 430, and United States v. State of Maine, 43 L.W. 4359 [420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363], the Judgment of the trial court is set aside and the case is remanded with directions to enter a Judgment of Acquittal as to the appellant-defendant.
The State has appealed from the superior court's judgment.
The basis for the superior court's reversal can be discerned only by reference to the cases it cites, Hjelle v. Brooks, 377 F. Supp. 430 (D.Alaska 1974) and United States v. Maine, 420 U.S. 515, 95 S.Ct. *931 1155, 43 L.Ed.2d 363 (1975). Hjelle v. Brooks embodies an earlier chapter in the history of Alaskas effort to regulate offshore fisheries. Crab fishermen from the state of Washington brought the action to enjoin enforcement of certain regulations promulgated by the Alaska Board of Fish and Game. Those regulations designated an area of the high seas in which king crab fishing was to be regulated, established a quota for that area, and prohibited possession or transportation of crab taken in violation of the quota system. A later regulation closed the area to all king crabbing after the quota had been met.
In Hjelle the three-judge federal district court granted the preliminary injunction sought by the fishermen, concluding that the plaintiffs were reasonably certain to prevail on the merits in their argument that the regulations violated due process. The gist of that argument was that, although the challenged regulations would be valid if enacted to further a legitimate interest in the State, these regulations did not properly advance such an interest. Rather, their sole objective was the regulation of an extraterritorial natural resource, which objective was beyond the reach of state police powers. Absent a more direct nexus to a legitimate state interest, the challenged regulations were necessarily invalid.
The decision in United States v. Maine, supra, raised a different issue, namely, whether the states on the Atlantic seaboard enjoyed any proprietary rights in the seabed and subsoil more than three miles from the coast. The United States Supreme Court reaffirmed the established precept that the federal government held paramount rights in the seabed as an incident of national sovereignty.
From this perspective we can infer the two possible rationales underlying the decision of the superior court in the case at bar. The first, relying upon Hjelle, is that AS 16.05.920(a) was invalid as applied because it purported to regulate a largely extraterritorial resource, in excess of state police powers. The second, drawing upon Maine, reasons that AS 16.05.920(a) as applied is actually an attempt to regulate a natural resource of the seabed, in contravention to paramount federal rights in those resources. The first possible rationale draws upon due process limitations on state police powers. The second invokes the doctrine of federal exclusivity. Ironically, neither rationale was among the arguments advanced by Sieminski.
We conclude that neither rationale correctly controls this case, and that the reversal of Sieminski's conviction by the superior court was error. In reaching this conclusion we draw upon our recent decision in State v. Bundrant, 546 P.2d 530 (Alaska 1976), in which we sustained state regulations governing crabbing in the Bering Sea.
The statutory charge in this case, AS 16.05.920(a), makes it unlawful for a person to take scallops "[u]nless permitted by this chapter or by regulation made under this chapter... ." The State's theory was that since none of the applicable scallop regulations authorized fishing at the time and location of Sieminski's alleged conduct, the statute was violated. That is to say, the State interprets AS 16.05.920(a) to expressly proscribe fishing activities in the high seas beyond the three mile limit. Viewed in this light, AS 16.05.920(a) is quite unlike a conventional "landing law", which only proscribes possession in state waters of fish taken in the high seas.[2]
*932 In State v. Bundrant, 546 P.2d 530 (Alaska 1976), we had occasion to pass on the validity of Alaska's high seas crabbing regulations. There we concluded that the State had a legitimate interest in the protection of the crab fishery in territorial waters, and that the regulations in question were a valid exercise of police power to attain that objective. 546 P.2d at 552-54. The evidence established that the state interest in the territorial crab resource was two-fold in nature: these crabs were subject to constant fishery harvest, thereby providing sustenance and economic gain to Alaska's shorebased communities; further, this crab resource helped support a larger marine ecosystem which was of inestimable importance to those Alaskans whose lives and livelihood depend on our marine resources. The evidence having demonstrated that those migratory crabs in state waters were an object of legitimate concern and interest for Alaska, and that regulation of extraterritorial crabbing efforts was reasonably necessary to advance that interest, we concluded that the crabbing regulations in question were within the ambit of the State's police powers.
Recognition in Bundrant of the State's interest in the crab resource found in our territorial waters has particular significance to this case. In the case at bar in the district court, the State acknowledged the need to establish a valid state interest, or "nexus," that would sustain regulation of scallop fishing in the high seas southeast of Kodiak Island. The State advanced a state interest in the crab resource, which we recognized in Bundrant, and presented testimony of fishermen and marine biologists which tended to prove that king, tanner and dungeness crab migrated in vast numbers from the territorial waters of the state to high seas areas where the scallop fishing was practiced. The evidence showed that the scallop fisheries were located in waters that contained a great abundance of harvestable crab. Commercial fishermen working the scallop fisheries in these waters take their catch by means of a scallop dredge, a large steel net that is dragged along the seabed. There was considerable testimony to the effect that this mode of fishing was highly destructive of the crab resource, inasmuch as a dredge would indiscriminately crush crabs and other shellfish as it gathered its catch.[3] Consequently, to preserve the valuable crab resource that migrated to these waters, the State has found it necessary to regulate the taking of both crabs and scallops, and to some extent to completely forbid the taking of scallops.
The State also produced evidence which supported a valid state interest in the scallop industry. In its brief the State summarized the history of scallop fisheries in Alaska in the following passage:
Commercial quantities of sea scallops have been sought in the Gulf of Alaska since 1953, but it was not until 1967, prompted by the continuing decline in catches of king crab that scallop fishing was conducted in earnest. In 1967, crab boats were converted to scallop dragging and the first commercial deliveries were made that year. Since that time scallop fishing has continued to improve and effort has increased until today, it would have to be included as a major yet not *933 fully developed, fishery in Alaska producing millions of dollars in net revenue annually to the appellee and similarly situated fishermen.
In order to protect and develop the scallop industry in Alaska, the State found it necessary to regulate the taking of scallops. The need for regulation in the scallop industry stems from biological factors similar to those found in the crab industry. Like crab, scallops are migratory and those taken within the territorial waters are indistinguishable from those taken without. In their early life cycle scallops, like crabs, are free floating larvae. As the scallop matures, it settles to the ocean bottom where it remains except during periods of motion. As the scallop grows in weight its ability to move lessens. However, at its "harvestable stage" the scallop is usually capable of some movement. The State maintained that in order to protect scallops within Alaska territorial waters, it is necessary to regulate the taking of scallops beyond those waters. Scallops, as well as crabs, are of vast importance to the Alaskans who depend on marine resources for sustenance or livelihood.[4]
From this evidence the trial court could have reasonably found that regulation of scallop fishing in the high seas immediately beyond Alaska's territorial waters was in furtherance of a legitimate state interest and therefore a valid exercise of the state's police power. Contrary to the Hjelle court, we do not find dispositive the mere fact that the terms of the scallop regulations go to extraterritorial conduct. As we concluded in Bundrant, at 554:
[A] state may reasonably extend its jurisdiction to control fish and game resources outside the limited area of its territorial sovereignty, if such an exercise is based on the conservation principles inherent in their migratory characteristics and not based on artificial boundaries or political circumstances.
As we intimated in Bundrant, 546 P.2d at 554-56, there is a second constraint on state regulation of extraterritorial fishing efforts: the regulations can be applied only against persons having a certain minimum relationship with the state. This requirement that there be a sufficient "nexus" between the fishermen and the state can be satisfied in any number of ways. It has long been established that citizenship in the state will suffice. That principle emanates from Skiriotes v. Florida, 313 U.S. 69, 77, 61 S.Ct. 924, 929, 85 L.Ed. 1193, 1200 (1941), wherein the United States Supreme Court said:
If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress.
Proof of state citizenship is, of course, not the only means by which this second requirement of nexus can be satisfied.
In the instant case the prosecution presented substantial evidence from which the trial court could have concluded that Sieminski was a resident of Alaska at the time of the charged offense. Among this evidence was Sieminski's 1973 application for resident fishing, gear, and vessel licenses,[5] and testimony that Sieminski operated his vessel out of Seward and sold his catch to a local Seward processor. Having before him this evidence of Sieminski's long-term residency, and in the absence of any evidence to the contrary, the trial court was warranted in concluding *934 that Sieminski was a "citizen" of this state as that term was used in Skiriotes.[6]
Consequently, we conclude that the legal principles controlling this case are those espoused in State v. Bundrant. Measured by the precepts of that decision, the enforcement of the state's regulatory scheme in this particular case was within the sphere of the state's prerogative to regulate extraterritorial fishing. In our opinion the federal decision in Hjelle circumscribed that sphere of authority too narrowly.[7] To the extent the superior court relied upon Hjelle in reversing the district court conviction in the case at bar, it erred.
The other case cited in the superior court's decision was United States v. Maine, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975). In our view Maine has little bearing on the case at bar. There is certainly nothing in that decision that by itself compels reversal of Sieminski's conviction. Maine reaffirmed the proposition first established in United States v. California, 332 U.S. 19, 67 S.Ct. 1658, 91 L.Ed. 1889 (1947), that paramount rights in the seabed and subsoil beyond the three mile limit were vested in the federal government. As we observed in Bundrant, however, that principle of federal exclusivity does not preclude state regulation of fishery resources in the waters over that seabed. State v. Bundrant, 546 P.2d 530, 543-44 (Alaska 1976). Thus, Alaska's regulation of Sieminski's scallop fishing activities is fully compatible with United States v. Maine.
Although we have concluded that the superior court erred in reversing Sieminski's conviction on the grounds it did, we do not reinstate the conviction. In the superior court Sieminski advanced two arguments challenging his conviction, neither of which was expressly accepted nor rejected by the superior court. The first asserted a theory of federal pre-emption. The thrust of the second theory was that the conviction was void because the statute under which he had been charged, AS 16.05.920(a), did not apply to the area in which he fished, nine miles offshore. The superior court did not pass on the merits of these contentions, concluding its Hjelle-Maine rationales sufficient to reverse the conviction. Since we have determined that the superior court's reversal based on these rationales was erroneous, it now becomes incumbent on the superior court to decide the validity of Sieminski's arguments. On remand the superior court should consider an additional issue which was not raised on appeal. The parties are to brief, and the superior court determine, whether AS 16.05.920(a) is unconstitutionally vague.[8] We therefore remand this case for further proceedings consistent with this opinion.
Reversed and remanded.
CONNOR, Justice (dissenting).
I respectfully dissent, for the reasons stated in my dissenting opinion in State v. *935 Bundrant, 546 P.2d 530, 559-64 (Alaska 1976).
I believe United States v. Maine, 420 U.S. 515, 95 S.Ct. 1155, 43 L.Ed.2d 363 (1975), on which the court below relied, is in harmony with the views I expressed in Bundrant. The United States Supreme Court in Maine, as I did in Bundrant, relied on the Submerged Lands Act, 43 U.S.C. § 1301 et seq., and the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., in support of federal, and in opposition to state, jurisdiction over the seabed and its resources outside the three-mile limit. 420 U.S. at 524-27, 95 S.Ct. 1155.
As in Bundrant, I do not reach the question whether these state regulations are a constitutionally valid exercise of the police power, the issue to which most of the majority opinion in this case, and Hjelle v. Brooks, 377 F. Supp. 430 (D.Alaska 1974), are addressed.
This is a scallop fishing case, while Bundrant dealt with crabs. This difference does not change my view of the applicable law. Although, unlike crabs, scallops at their harvestable stage are not in constant contact with the sea floor, they remain close to it at all times. They are caught with a metal dredge which is towed along the seabed. Scallops are not included in the list of sedentary continental shelf species in federal fisheries law, 16 U.S.C. § 1085; 16 U.S.C. § 1802(4); 50 C.F.R. § 295.4 (as revised June 24, 1976, 41 Fed. Reg. 26020 (1976)). Nevertheless, the evidence indicates that they are less mobile than crabs. The dredges used to catch scallops kill crabs. Hence I agree with the state that it is particularly important that the same authority regulate the taking of both species. This is another reason why I believe that the scallops' ability to leave the sea floor in order to move does not distinguish them for these purposes from crabs, and that their exclusion from these statutory lists is not dispositive.
In any event, that crabs are a sedentary resource of the continental shelf was only one of the three grounds on which I dissented in Bundrant. I remain convinced, as I stated there, that regardless of whether crabs, or scallops, are characterized as appurtenant to the continental shelf, regulation of the fishery outside the three-mile limit is within federal, not state, jurisdiction.
Congress worked from the same premise earlier this year in enacting the statute extending the United States fisheries zone from 12 to 200 miles. 16 U.S.C. § 1801 et seq. (effective March 1, 1977). With exceptions not here relevant, the statute explicitly neither extends nor diminishes "the jurisdiction or authority of any State within its boundaries." 16 U.S.C. § 1856(a). Congressional conferees interpreted this to mean that the statute neither extends nor diminishes the jurisdiction of any state at all. S.Rept. No. 94-711 (1976) at 55, reprinted in 1976 U.S.Code Cong. & Adm. News No. 4, at p. 1041. The House Committee on Merchant Marine and Fisheries, in its report on the bill, stated that the jurisdiction over fisheries outside the three-mile limit was solely federal, and that if there was to be any regulation of fishing there, it must be federal regulation. H. Rept. No. 94-445 (1975) at 29, reprinted in 1976 U.S.Code Cong. & Adm.News No. 4, at 963-64.
I would affirm the judgment of the superior court ordering that the defendant be acquitted.
NOTES
[1] Mr. Nesbett's appearance in this case was limited to argument of a motion to accept the brief which had been filed in the superior court as appellee's brief on appeal. That motion was denied by this court.
[2] AS 16.10.200 is a typical "landing law," providing:

It is unlawful for a person taking migratory fish and migratory shellfish in high sea areas designated by the board or in violation of the rules and regulations promulgated by the board governing the taking of migratory fish and migratory shellfish in the designated areas to possess, sell, offer to sell, barter, offer to barter, give or transport in the state, including the waters of the state, migratory fish or migratory shellfish.
The court in Hjelle v. Brooks, 377 F. Supp. 430 (D.Alaska 1974), reviewed a number of federal and state cases which sustained conventional landing laws, extracting the principle that a state may directly regulate extraterritorial conduct only if that regulation facilitates conservation of a resource clearly within the state. Id. at 441. In the court's view, however, the object of the challenged Alaskan crabbing laws was the regulation of the high seas crab fishery resource, an attempt beyond the reach of state police power. There being no legitimate state interest to support the regulations, the Hjelle court concluded the fishermen were reasonably certain to establish their invalidity when the merits of the case were heard.
[3] The State asserts that "When the dredge comes in contact with the comparatively soft shells of the crab, the mortality is very high (as much as 79%), killing immature crab of both sexes indiscriminately (fishing for immature and female crab is impermissible in Alaska)."
[4] Scallop fishing in Alaska between 1968 and 1972 resulted in average receipts to fishermen of over one million dollars annually.
[5] On the application appellee stated that he was an Alaskan resident, had resided in Alaska for more than four years, and was at that time living in Seward.
[6] Cf. Skiriotes v. Florida, 313 U.S. 69, 71-72, 61 S.Ct. 924, 926-927, 85 L.Ed. 1193, 1197-98 (1941). We note that in considering the possible application of Skiriotes at least two courts have used the terms "citizen" and "resident" interchangeably. Martinsen v. Mullaney, 85 F. Supp. 76, 12 Alaska 455 (D. Alaska 1949); Ghera v. Department of Fish and Game, No. 47823 SAW (N.D.Cal. 1973).
[7] For a fuller discussion of our reasons for distinguishing Hjelle, see State v. Bundrant, 546 P.2d 530, 552-54 (Alaska 1976).
[8] See, e.g., Marks v. City of Anchorage, 500 P.2d 644 (Alaska 1972). We will not consider this issue at this time since the parties have not yet briefed this point. See ABA Standards Relating to Appellate Courts § 3.11 (Tentative Draft 1976). The Report of the Committee of the Conference of Chief Justice notes that the review of issues not specifically preserved for appeal results in "appellate decisions on issues which were neither briefed nor argued by the parties nor presented for decision to the courts below." Comment to Standard 3.11. Although we continue to review "plain errors," the adversarial system in which all issues later raised on appeal are briefed, argued and presented for the court's determination should be utilized whenever possible.