STATE of Alaska, Petitioner,

v.

Vernon G. JACK, V, Respondent.

No. S–11051.

Supreme Court of Alaska.

Dec. 12, 2005.

W.H. Hawley, Assistant Attorney General, Anchorage, Gregg D. Renkes, Attorney General, Juneau, for Petitioner.

---

**1.** *State v. Jack,* 67 P.3d 673, 674 (Alaska App.     2003).

Margi A. Mock, Assistant Public Defender, Barbara K. Brink, Public Defender, Anchorage, for Respondent.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

MATTHEWS, Justice.

Vernon Jack is charged under the Alaska criminal code with committing a sexual assault while on an Alaska state ferry in Canadian waters. The question is whether Alaska has jurisdiction to prosecute him. We conclude that jurisdiction exists for two reasons. First, AS 44.03.010(2) grants offshore jurisdiction to the State to the extent that the United States has jurisdiction, and the United States has jurisdiction in this case. Second, Alaska has jurisdiction under the widely recognized "effects doctrine."

## I. FACTS AND PROCEEDINGS

The facts as stated in Judge Stewart's opinion for the court of appeals are as follows:

On May 12, 2001, the Alaska state ferry Matanuska was navigating the Inside Passage on a voyage from Bellingham, Washington, to Southeast Alaska. According to the grand jury's indictment, while the Matanuska cruised through Canadian territorial waters, Vernon G. Jack, V, engaged in sexual contact and sexual penetration with S.N.F. and physically assaulted her. An Alaska State Trooper who happened to be aboard the Matanuska investigated Jack's conduct and arrested him. The grand jury in Ketchikan charged Jack with one count of first-degree sexual assault, one count of second-degree sexual assault, and four counts of fourth-degree assault for his misconduct aboard the Matanuska while it was in Canadian territorial waters.[1]

Jack moved to dismiss the indictment on jurisdictional grounds. The superior court granted his motion. On the State's petition for review, the court of appeals affirmed. We granted the State's petition for review.

## II. ARGUMENTS OF THE PARTIES

The statutory sections most directly involved are AS 44.03.010(2) and AS 44.03.030(1). These sections provide:

AS 44.03.010:

> The jurisdiction of the state extends to water offshore from the coast of the state as follows:
>
> . . . .
>
> (2) the high seas to the extent that jurisdiction is claimed by the United States of America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or the state is a party[.]

AS 44.03.030:

> This chapter does not limit or restrict
>
> (1) the jurisdiction of the state over a person or subject inside or outside the state that is exercisable by reason of citizenship, residence, or another reason recognized by law[.] [2]

The State argues in general that these sections reflect that the legislature intended to provide for extraterritorial jurisdiction [3] that is as broad as may be permitted under the United States Constitution. Focusing on subsection .010(2) the State contends that this section gives the State of Alaska jurisdiction when the United States would have jurisdiction over acts committed on the high seas. The State contends that the term "high seas" was generally understood in 1959, when the statute was enacted, to encompass foreign territorial waters, and that the United States has jurisdiction over crimes committed aboard U.S. vessels in foreign territorial waters. The State contends that since the Matanuska is a U.S. vessel, the United States has jurisdiction, and therefore, under subsection .010(2), so does the State of Alaska.

The State notes that an additional element is needed for the exercise of state extraterritorial jurisdiction under any theory. The State must have a substantial interest that justifies the exercise of jurisdiction. This requirement is met, according to the State,

---

**2.** We set out here the full text of AS 44.03.010 and AS 44.03.030, and the other statutory sections that were enacted with it, AS 44.03.020 and .040:

AS 44.03.010 provides:
> The jurisdiction of the state extends to water offshore from the coast of the state as follows:
> (1) the marginal sea to its outermost limits as those limits are from time to time defined or recognized by the United States of America by international treaty or otherwise;
> (2) the high seas to the extent that jurisdiction is claimed by the United States of America, or to the extent recognized by the usages and customs of international law or by agreement to which the United States of America or the state is a party;
> (3) submerged land including the subsurface of submerged land, lying under the water mentioned in this section.

AS 44.03.020 provides:
> The ownership of the water and submerged land described in AS 44.03.010 is in the state unless ownership of a parcel or area is held by a person or entity by a valid and effective instrument of conveyance or by operation of law.

AS 44.03.030 provides:
> This chapter does not limit or restrict
> (1) the jurisdiction of the state over a person or subject inside or outside the state that is exercisable by reason of citizenship, residence, or another reason recognized by law;
> (2) jurisdiction over or ownership of other water or land under other water inside or forming part of the boundaries of the state;
> (3) legislative jurisdiction of the United States over an area to which legislative jurisdiction is ceded by the state and which remains in the ownership of the United States.

AS 44.03.040 provides:
> This chapter does not alter the geographic area to which a statute of the state applies if the statute specifies the area precisely in miles or by another numerical designation of distance or position. Nothing in the statute or in this chapter is a waiver or relinquishment of jurisdiction over or ownership by the state of an area to which jurisdiction or ownership extends under another provision or rule of law.

**3.** There are three categories of extraterritorial jurisdiction:
> (a) jurisdiction to prescribe, i.e., the authority of a state to make its law applicable to persons or activities; (b) jurisdiction to adjudicate, i.e., the authority of a state to subject particular persons or things to its judicial process; and (c) jurisdiction to enforce, i.e., the authority of a state to use the resources of government to induce or compel compliance with its law.

Restatement (Third) of the Foreign Relations Law of the United States, Introductory Note to Part IV (1987). The parties make no distinction between these categories in this case and we believe that all three are involved.

because it has a strong interest in protecting the personal safety of individuals onboard state-owned ferries.

Jack argues that neither subsection .010(2) nor subsection .030(1) was meant to extend state jurisdiction to the maximum that would be permitted by the federal constitution. As to subsection .030(1), Jack contends that it "simply authorizes the state to claim bases of jurisdiction other than territorial, to the maximum extent permitted by law." Jack argues that this authorization can only be exercised by additional legislation and there is no additional legislation that is applicable to this case.

Jack also argues that AS 44.03.010(2) does not apply because the Canadian territorial waters where the alleged crime occurred are not "high seas" within the meaning of the statute. Further, and "[m]ore importantly," Jack contends the waters are not "offshore from the coast of the state." [4] In addition Jack argues that subsection (3) of AS 44.03.010 and AS 44.03.020 indicate that the reach of subsection .010(2) should be circumscribed because they extend jurisdiction to and assert ownership of submerged land including subsurface resources "lying under

the water mentioned" in section .010. Jack argues that subsection (2) can extend only to waters over submerged lands to which the State might have a reasonable jurisdictional and ownership claim. No such claim could be asserted concerning submerged land in Canadian territorial waters.

## III. DISCUSSION

### A. The Statute Should Be Broadly Construed

The statutory sections involved here were enacted in 1959 by the First Alaska Legislature as part of Chapter 89 of the 1959 Session Laws of Alaska. We set forth in the margin the full text of Chapter 89.[5] The revisor of statutes revised Chapter 89 as a part of the bulk formal revision that took place in 1962, but it has not otherwise been amended. Because the revisor of statutes is not permitted to change the meaning of a statute, we consider the original session law language when interpreting what the statute means.[6]

Section 1 of Chapter 89 contained, in its original form, language indicating that the state's jurisdiction should be broadly con-

---

4. AS 44.03.010.

5. Chapter 89, SLA 1959 provides:

> Be it enacted by the Legislature of the State of Alaska:
> Section 1. The jurisdiction of this State shall extend to and over, and be exercisable with respect to, waters offshore from the coasts of this State as follows:
> (1) The marginal sea to its outermost limits as said limits may from time to time be defined or recognized by the United States of America by international treaty or otherwise.
> (2) The high seas to whatever extent jurisdiction therein may be claimed by the United States of America, or to whatever extent may be recognized by the usages and customs of international law or by any agreement, international or otherwise, to which the United States of America or this State may be party.
> (3) All submerged lands including the subsurface thereof, lying under said aforementioned waters.
> Sec. 2. The ownership of the waters and submerged lands enumerated or described in Section 1 of this act shall be in this State unless it shall be, with respect to any given parcel or area, in any other person or entity by virtue of a valid and effective instrument of conveyance or by operation of law.

> Sec. 3. Nothing contained herein shall be construed to limit or restrict in any way:
> (1) The jurisdiction of this State over any person or with respect to any subject within or without the State which jurisdiction is exercisable by reason of citizenship, residence or for any other reason recognized by law.
> (2) Jurisdiction or ownership of or over any other waters or lands thereunder, within or forming part of the boundaries of this State. Nor shall anything herein be construed to impair the exercise of legislative jurisdiction by the United States of America over any area to which such jurisdiction has been validly ceded by this State and which remains in the ownership of the United States of America.
> Sec. 4. Nothing in this act shall alter the geographic area to which any statute of this State applies if such statute specifies such area precisely in miles or by some other numerical designation of distance or position. However, nothing in any such statute or in this act shall be construed as a waiver or relinquishment of jurisdiction or ownership by the State over or in any area to which such jurisdiction or ownership extends by virtue of this act or any other provision or rule of law.

6. See Employment Sec. Comm'n v. Wilson, 461 P.2d 425, 428 (Alaska 1969).

strued. The first sentence of section 1 stated that the jurisdiction of the state not only "extends to water offshore" [7] but *"shall ex-tend to and over, and be exercisable with respect to, waters offshore...."* [8] Further, subsection (2) underscored the breadth of the intended reach of state jurisdiction by use of inclusive words and phrases such as "whatever," "may be," "any," and "or otherwise." Thus in its original form section 1(2) provided:

The jurisdiction of this State *shall* extend *to and over, and be exercisable with respect to, waters* offshore from the *coasts* of this State as follows ... (2) The high seas to *whatever* extent jurisdiction *therein may be* claimed by the United States of America, or to *whatever* extent *may be* recognized by the usages and customs of international law or by *any* agreement, *international or otherwise,* to which the United States of America or this State *may be* party.[9]

That Chapter 89 was intended to reflect a broad assertion of state jurisdiction is also evident from its other sections. Both section 3(1) and section 4 make it clear that the provisions of Chapter 89 are not to be construed to limit state jurisdiction. Section 3(1) also suggests that extraterritorial jurisdiction over a person or subject "is exercisable by reason of citizenship, residence or *for any other reason recognized by law.*" [10] Similarly, section 4 implies that state jurisdiction over an area may be extended "under another provision or *rule of law.*" [11] Thus Chapter 89 implies that state jurisdiction is to be defined by recognized legal principles even if they are not part of any statute. It is unlikely that a legislature expressing this position would intend anything other than that a broad construction be given to the statutory jurisdictional provisions that it enacted.

## B. Jurisdiction Under AS 44.03.010(2)

### 1. High seas

One issue that must be resolved is whether the term "high seas" as used in AS 44.03.010(2) encompasses the Canadian territorial waters where the alleged sexual assault took place. The State argues that the term as understood in 1959 when the statute was enacted "includes all ocean waters outside the boundaries of the low-water mark and therefore the territorial waters of Canada." Jack, by contrast, argues that "high seas" encompasses "only those seas beyond the territorial waters of any nation." Jack agrees that at one time "it was undisputed that the term 'high seas' included all waters outside the boundary of the low water mark" but contends that "by the second half of the twentieth century" the general understanding had changed to the more narrow view that he espouses.

The revised fourth edition of Black's Law Dictionary, published in 1968, gives several definitions of the term "high seas," including those advocated by the parties. Thus, in support of the State's view, Black's defines "high seas" as simply "the ocean" or as beginning "according to the American view, at low-water mark," or still further, as "any waters on the sea-coast which are without the boundaries of low-water mark." [12] In support of Jack's view, Black's also defines "high seas" as "the waters of the ocean without the boundary of any country." [13]

In view of the broad interpretation that should be given to the statute, we think that the State's definition encompassing all ocean waters beyond the boundaries of the low-water mark is appropriate. Relatedly, since AS 44.03.010(2) provides that jurisdiction of the state duplicates the high seas jurisdiction of the United States, case law pertaining to the high seas jurisdiction of the United States is also relevant. There is case law

---

7. AS 44.03.010.

8. Ch. 89, § 1, SLA 1959 (emphasis indicates words the revisor omitted or altered).

9. *Id.*

10. *Id.* § 3 (emphasis added).

11. *Id.* § 4 (emphasis added).

12. Black's Law Dictionary 1516 (4th ed. rev. 1968).

13. *Id.*

that applies the term "high seas" to foreign territorial waters.[14]

## 2. Water offshore from the coast of the state

Jack argues that the introductory language of AS 44.03.010 extending the jurisdiction of the state "to water offshore from the coast of the state," necessarily excludes the Canadian waters involved here. He argues that "[t]his court must assume that the legislature intended that the introductory clause have an operative effect on subsection (2)" and contends that "[t]he coastal waters of Alaska do not extend farther than the northern and southern borders of the state."

While we can accept Jack's statement that the coastal waters of Alaska do not extend beyond the northern and southern boundaries of the state, that does not mean that the water *offshore* from Alaska's coasts is limited by its northern and southern borders. The term "offshore" does not necessarily connote any particular distance from the coast. One definition of "offshore" as an adjective is "distant from the shore." [15] We

note also that Alaska's coastline is extensive and faces in all directions, including southeast across the Gulf of Alaska toward the route of the Alaska Marine Highway in question here.

But we do not believe that there is either a distance or a compass-point directional component to the "water offshore" phrase as it is used in section .010. Given that subsection (2) undertakes to duplicate the high seas jurisdiction of the United States, it would be strange to use a phrase so devoid of useful limits if the intent actually were to constrain the State's exercise of high seas jurisdiction. In our view the function of the phrase is simply to distinguish between ocean waters seaward from the coast of Alaska, to which the statute may apply if the conditions of the statute are met, and waters landward from the coast of Alaska, that is, Alaska inland waters, to which the statute does not apply.[16] We conclude therefore that the crime alleged in this case occurred in "water offshore from the coast" of Alaska within the meaning of that phrase as used in AS 44.03.010.

**14.** *See United States v. Dewey,* 188 U.S. 254, 271, 23 S.Ct. 415, 47 L.Ed. 463 (1903) ("[T]he high seas include coast waters without the boundaries of low-water mark, though within bays or roadsteads,—waters on which a court of admiralty has jurisdiction."); *United States v. Rodgers,* 150 U.S. 249, 261–64, 14 S.Ct. 109, 37 L.Ed. 1071 (1893) ("The term [high seas], in the eye of reason, is applicable to the open, uninclosed portion of all large bodies of navigable waters, whose extent cannot be measured by one's vision, and the navigation of which is free to all nations and people on their borders, by whatever names those bodies may be locally designated," regardless of whether the waters are within the territory of another nation.); *United States v. Ross,* 27 F. Cas. 899, 900 (C.C.R.I.1813) (No. 16,196) ("[T]he words, 'high seas,' mean any waters on the sea coast, which are without the boundaries of low water mark; although such waters may be in a roadstead or bay within the jurisdictional limits of a foreign government."); *see also Murray v. Hildreth,* 61 F.2d 483, 484 (5th Cir.1932) ("The term 'high seas' includes waters on the sea-coast without the boundaries of low-water mark.") (internal quotations omitted). There is also case law that supports Jack's view. *See, e.g., Maul v. United States,* 274 U.S. 501, 511, 47 S.Ct. 735, 71 L.Ed. 1171 (1927) ("The high sea is common to all nations and foreign to none...."); *Cunard S.S. Co. v. Mellon,* 262 U.S. 100, 123, 43 S.Ct. 504, 67 L.Ed. 894 (1923) ("[O]n the high seas ... there is no territorial sovereign...."); *United States v. Wilson,* 28 F.

Cas. 718, 720 (C.C.N.Y.1856) (No. 16,731) ("[T]he term high seas alone embraces no waters that are land-locked in their position, and are subject to territorial jurisdiction.").

**15.** WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1568 (1966).

**16.** We use here the terms used by the United States Supreme Court in *United States v. Maine,* 469 U.S. 504, 512–13, 105 S.Ct. 992, 83 L.Ed.2d 998 (1985), in describing the operation of the Submerged Lands Act, 43 U.S.C. § 1312:

> Under § 4 of the Submerged Lands Act, 43 U.S.C. § 1312, a coastal State's boundary is measured from its legal coastline. The coastline is defined as "the line of ordinary low water along that portion of the coast which is in direct contact with the open sea and the line marking the seaward limit of inland waters." § 1301(c). A State's seaward boundary generally is set as a line three geographical miles distant from its coastline. § 1312. Waters landward of the coastline therefore are internal waters of the State, while waters up to three miles seaward of the coastline are also within a State's boundary as part of the 3-mile ring referred to as the marginal sea.[6]
>   [6] Under § 3(a) of the Submerged Lands Act the States have title to and ownership of the lands beneath navigable waters within their boundaries. 43 U.S.C. § 1311(a).

### 3. Submerged lands provisions

As noted above, Jack argues that the submerged lands provisions of subsection .010(3) and section .020 limit the high seas jurisdiction exercisable under subsection .010(2). Subsection .010(3) and section .020 assert claims of jurisdiction and ownership over the surface and subsurface "of submerged land ... lying under the water mentioned in this section," referring generally to section .010. Since any claim by Alaska over submerged lands in Canadian territorial waters would be an absurdity, Jack contends that this means that "high seas" as used in subsection .010(2) cannot extend to Canadian territorial waters.

We do not believe that subsection .010(2) and the submerged lands provisions are as closely linked as Jack contends. It is clear that high seas jurisdiction under subsection (2) extends beyond the "marginal sea" mentioned in subsection (1). The "marginal sea" encompasses at least all of the state's territorial waters, generally extending three miles from the coast.[17] The "high seas" are intended to extend beyond the marginal sea, otherwise there would be no need for subsection (2). But there has never been a plausible basis for the state to assert ownership of submerged land beyond the three-mile limit, and even more clearly, beyond the outermost limits of the marginal sea.[18] Thus if Jack's argument is right, subsection (2) jurisdiction would not extend beyond the marginal sea and subsection (2) would be completely superfluous. This is clearly not what the legislature intended.

Further support for the view that neither subsection (3) of section .010 nor AS 44.03.020 should be read as limiting high seas

jurisdiction is found in the nonwaiver clause of AS 44.03.040, as it was originally phrased in section 4 of Chapter 89 of the Session Laws of Alaska of 1959.[19] As so phrased the clause stated that "nothing ... in this act shall be construed as a waiver or relinquishment of jurisdiction ... by the State over or in any area to which such jurisdiction ... extends by virtue of this act...."[20] This suggests that the various jurisdictional-bestowing sections and subsections of the act were intended to be construed independently and not as limiting one another. The same conclusion could also be reached merely by applying a rule of broad construction, for it is not logically necessary to read subsection .010(3) or section .020 as limitations on the jurisdiction expressed in subsection .010(2).

For these reasons we believe that the submerged lands provisions cannot be read as limiting high seas jurisdiction under subsection .010(2). Instead, it seems reasonable to interpret the provisions as containing an implied clause stating something like "to the extent permitted by the constitution and laws of the United States."

### 4. United States jurisdiction

Since the State has high seas jurisdiction under AS 44.03.010(2) only to the extent that the United States also has jurisdiction, we discuss next why the United States could exercise jurisdiction in this case. United States criminal jurisdiction exists over crimes committed on United States flagged ships, even when they are in foreign territorial water, if the local sovereign has not asserted jurisdiction.[21] Generally, the

---

17. *See Maine,* 469 U.S. at 513, 105 S.Ct. 992; *State v. Sieminski,* 556 P.2d 929, 930 (Alaska 1976).

18. *See Maine,* 469 U.S. at 512–13, 105 S.Ct. 992.

19. *See supra* page 314.

20. Ch. 89, § 4, SLA 1959.

21. *United States v. Flores,* 289 U.S. 137, 150, 53 S.Ct. 580, 77 L.Ed. 1086 (1933). *See Lauritzen v. Larsen,* 345 U.S. 571, 584–86, 73 S.Ct. 921, 97 L.Ed. 1254 (1953):

Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag. Each state under international law may determine for itself the conditions on which it will grant its nationality to a merchant ship, thereby accepting responsibility for it and acquiring authority over it. Nationality is evidenced to the world by the ship's papers and its flag....

This Court has said that the law of the flag supersedes the territorial principle, even for purposes of criminal jurisdiction of personnel of a merchant ship, because it "is deemed to be a part of the territory of that sovereignty (whose flag it flies), and not to lose that character when in navigable waters within the territorial limits of another sovereignty."...

local sovereign is not permitted to assert jurisdiction over the United States or other foreign vessels unless the "peace or dignity of the country, or the tranquillity[tranquility] of the port" is involved.[22] Under the right of innocent passage doctrine, a coastal nation is not authorized to assert jurisdiction over a foreign vessel unless "the consequences of the crime extend[s] to the coastal State," or "the crime is of a kind to disturb the peace of the country or the good order of the territorial sea."[23] Absent an assertion of local sovereign jurisdiction, "it is the duty of the courts of the United States to apply to offenses committed by its citizens on vessels flying its flag, its own statutes, interpreted in the light of recognized principles of international law."[24] Here there has been no assertion of Canadian jurisdiction. Thus the United States has jurisdiction.[25]

■ Even though the jurisdictional prerequisites of AS 44.03.010(2) are satisfied, there is an additional requirement that must be met. The State must have a substantial interest in order to exercise jurisdiction. Under the circumstances of this case the State's interest also serves as an independent basis for the exercise of jurisdiction under the effects doctrine. We discuss it in the section that follows.

### C. Jurisdiction Under the Effects Doctrine

#### 1. State extraterritorial jurisdiction in general

■ In general, a state may exercise extraterritorial jurisdiction when three conditions are present: (1) there must be a sufficient state interest, (2) there can be no conflict with federal law, and (3) the crime in question must not have been prosecuted by federal authorities, or the authorities of a foreign jurisdiction.[26]

The much-cited case of *Skiriotes v. Florida* supports the exercise of extraterritorial state jurisdiction on several grounds.[27] *Skiriotes* involved a prosecution by the State of Florida of a fisherman for taking sponges with prohibited equipment some six miles offshore.[28] The fisherman's conviction was upheld by the United States Supreme Court.[29]

> It is significant to us here that the weight given to the ensign overbears most other connecting events in determining applicable law.... "And so by comity it came to be generally understood among civilized nations that all matters of discipline, and all things done on board, which affected only the vessel, or those belonging to her, and did not involve the peace or dignity of the country, or the tranquillity[tranquility] of the port, should be left by the local government to be dealt with by the authorities of the nation to which the vessel belonged as the laws of that nation, or the interests of its commerce should require." (Footnotes and citations omitted.)

**22.** *Lauritzen*, 345 U.S. at 585–86, 73 S.Ct. 921 (quoting *Flores*, 289 U.S. at 158, 53 S.Ct. 580); *see also Mali v. Keeper of the Common Jail*, 120 U.S. 1, 14, 7 S.Ct. 385, 30 L.Ed. 565 (1887).

**23.** United Nations Convention on the Law of the Sea, Dec. 10, 1982, art. 27, *reprinted in* 3 Thomas J. Schoenbaum, Admiralty and Maritime Law app. C, at 175–76 (4th ed.2004); Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, art. 19(1), *reprinted in id.* at 145.

**24.** *Flores*, 289 U.S. at 159, 53 S.Ct. 580; *accord United States v. Reagan*, 453 F.2d 165, 169–71 (6th Cir.1971).

**25.** According to the State, the United States has also not manifested an interest in prosecuting Jack.

**26.** "If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State ... may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the State has a legitimate interest and where there is no conflict with acts of Congress." *Skiriotes v. Florida*, 313 U.S. 69, 77, 61 S.Ct. 924, 85 L.Ed. 1193 (1941); *see also Flores*, 289 U.S. at 159, 53 S.Ct. 580 (finding that it is the duty of United States courts to apply United States laws "[i]n the absence of ... any assertion of jurisdiction by the territorial sovereign"); *Sieminski*, 556 P.2d at 933; *State v. Bundrant*, 546 P.2d 530, 552 (Alaska 1976); *Corbin v. State*, 672 P.2d 156 (Alaska App.1983); *State v. Stepansky*, 761 So.2d 1027, 1036 (Fla. 2000) (emphasizing that the statute at issue limited state jurisdiction "by operating only where the crime has not been prosecuted by any other government entity, including the federal government or the foreign country in which the ship is registered").

**27.** 313 U.S. 69, 61 S.Ct. 924, 85 L.Ed. 1193 (1941).

**28.** *Id.* at 70, 61 S.Ct. 924.

**29.** *Id.* at 79, 61 S.Ct. 924.

The Court assumed that the offense was committed outside the territorial waters of Florida, but nonetheless indicated that the state had jurisdiction. The Court observed that "Florida has an interest in the proper maintenance of the sponge fishery," [30] and that this plus the power of the state to govern the conduct of its citizens was sufficient to give Florida jurisdiction:

> If the United States may control the conduct of its citizens upon the high seas, we see no reason why the State of Florida may not likewise govern the conduct of its citizens upon the high seas with respect to matters in which the state has a legitimate interest and where there is no conflict with acts of Congress.[31]

The Court also suggested that jurisdiction could be based on the fact that the fisherman conducted his operations "by means of Florida boats." [32] This meant that the principle that "a vessel at sea is regarded as part of the territory of the state" could also supply a basis for jurisdiction.[33]

### 2. The effects doctrine

■ The effects doctrine recognizes that a state may exercise extraterritorial jurisdiction over conduct outside the state that has or is intended to have a substantial effect within the state so long as the exercise of jurisdiction does not conflict with federal law and is otherwise reasonable. The effects doctrine is widely recognized and accepted.[34]

This court has utilized the effects doctrine as the basis for the exercise of state extraterritorial jurisdiction. In *State v. Bundrant* we held that state crabbing regulations could be applied extraterritorially to non-citizens.[35] We noted that the species in question was migratory between state waters and adjacent areas of the high seas and that regulation of the latter areas was necessary to protect and preserve a state fishery.[36] In response to an argument that *Skiriotes* only permitted the State to apply its laws to Alaska citizens we invoked the effects doctrine "that acts done outside a jurisdiction which produce detrimental effects inside it justify a state in punishing he who caused harm as if he had been present at the place of its effect." [37] We concluded on the basis of this principle that the application of Alaska's crab fishing regulations extraterritorially was a proper extension of the police power of the state,

30. *Id.* at 75, 61 S.Ct. 924.

31. *Id.* at 77, 61 S.Ct. 924.

32. *Id.* at 78, 61 S.Ct. 924.

33. *Id.*

34. RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 402(1)(c) (1987). *See, e.g., Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (relying on effects doctrine to find jurisdiction); *United States v. Nippon Paper Indus. Co., Ltd.*, 109 F.3d 1, 9 (1st Cir.1997) (same); *United States v. Davis*, 767 F.2d 1025, 1036 (2d Cir.1985) (same; citing the Restatement); *State v. Miller*, 157 Ariz. 129, 755 P.2d 434, 437–38 (App.1988) (citing the Restatement and finding no jurisdiction where defendant's conduct did not, and was not intended to, have substantial effects within the state); Jonathan Turley, *"When in Rome": Multinational Misconduct and the Presumption Against Extraterritoriality*, 84 NW. U.L.REV. 598, 611 (1990) (noting the gradual embrace of the effects doctrine); Ryuichi Yamakawa, *Territoriality and Extraterritoriality: Coverage of Fair Employment Laws After EEOC v. Aramco*, 17 N.C. J. INT'L L. & COM. REG. 71, 75 (1992) (citing the

widespread acceptance of the effects doctrine in the U.S.).

35. 546 P.2d 530, 554–56 (Alaska 1976).

36. *Id.* at 552.

37. *Id.* at 555. In support of this statement we cited *Strassheim v. Daily*, 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735 (1911), a seminal case on the effects doctrine; we also cited section 18 of the Restatement (Second) of Foreign Relations (1965), which defined the effects doctrine as follows:

> A state has jurisdiction to prescribe a rule of law attaching legal consequences to conduct that occurs outside its territory and causes an effect within its territory, if either
> (a) the conduct and its effect are generally recognized as constituent elements of a crime or tort under the law of states that have reasonably developed legal systems, or
> (b) (i) the conduct and its effect are constituent elements of activity to which the rule applies; (ii) the effect within the territory is substantial; (iii) it occurs as a direct and foreseeable result of the conduct outside the territory; and (iv) the rule is not inconsistent with the principles of justice generally recog-

regardless of the residence or citizenship of a violator.[38]

The Supreme Court of Florida in *State v. Stepansky* recognized that *Bundrant* and *Sieminski* reflect the principles incorporated in the effects doctrine.[39] The *Stepansky* case illustrates the application of the effects doctrine to circumstances resembling the case before this court. Stepansky was charged in a Florida state court with, among other things, attempted sexual battery of a minor onboard a cruise ship while it was located some 100 miles off the coast of Florida. The ship departed from and returned to a Florida port, but it was owned by a foreign corporation and registered in Liberia. The charge was premised on a maritime jurisdiction statute of the State of Florida granting jurisdiction over criminal acts committed on a ship during a voyage on which over half of the passengers embarked and planned to disembark in Florida. The court held that jurisdiction under this statute was permitted under the effects doctrine.[40]

At the outset the court recognized that the effects doctrine had its roots in the United States Supreme Court case of *Strassheim v. Daily*.[41] In that case the State of Michigan sought to extradite the defendant from Illinois to respond to charges of fraud and brib-

ery with respect to machinery that he had sold to the State of Michigan. The extradition proceeding was challenged and Daily claimed that he was not in Michigan at the time of the crimes. The district court held that Michigan lacked jurisdiction.[42] But the United State Supreme Court reversed in an opinion by Justice Holmes which concluded that Michigan could prosecute for acts which occurred outside of the state:

> If a jury should believe the evidence, and find that Daily did the acts that led Armstrong to betray his trust, deceived the board of control, and induced by fraud the payment by the state, the usage of the civilized world would warrant Michigan in punishing him, although he never had set foot in the state until after the fraud was complete. Acts done outside a jurisdiction, but intended to produce and producing detrimental effects within it, justify a state in punishing the cause of harm as if he had been present at the effect, if the state should succeed in getting him within its power.[43]

*Stepansky* also relied on the expression of the effects doctrine in the Restatement (Third) of the Foreign Relations Law of the United States.[44]

> The Restatement of Foreign Relations provides:
> [A] state has jurisdiction to prescribe law with respect to: (1)(a) conduct that, wholly or in substantial part, takes place within its territory;
> (b) the status of persons, or interests in things, present within its territory;
> (c) *conduct outside its territory that has or is intended to have substantial effect within its territory;*
> (2) the activities, interests, status, or relations of its nationals outside as well as within its territory; and
> (3) certain conduct outside its territory by persons not its nationals that is directed against the security of the state or against a limited class of other state interests.
> Restatement, *supra*, § 402 (emphasis supplied). Accordingly, the Restatement recognizes that states may prosecute a person for an act committed outside the state on the basis that the act has a substantial effect within the state, similar to the ability to prosecute an act that occurred wholly or partially within the territory of the state. *See id.* § 402(1). This is in addition to the ability of states to prosecute on the basis that the defendant is a citizen, resi-

nized by states that have reasonably developed legal systems.

**38.** *Bundrant*, 546 P.2d at 556. In *Sieminski*, 556 P.2d 929, this court followed *Bundrant* and held that the State had a sufficient interest to exercise extraterritorial jurisdiction over the taking of scallops on the high seas outside of state territorial waters. In *F/V American Eagle v. State*, 620 P.2d 657 (Alaska 1980), we reaffirmed *Bundrant* in upholding the forfeiture of a bond representing the value of a crab fishing vessel that was seized for fishing out of season in waters beyond the three-mile limit.

**39.** 761 So.2d at 1035.

**40.** *Id.* at 1036–37.

**41.** 221 U.S. 280, 31 S.Ct. 558, 55 L.Ed. 735.

**42.** *Id.* at 281–82, 31 S.Ct. 558.

**43.** *Id.* at 284–85, 31 S.Ct. 558.

**44.** 761 So.2d at 1035. The court set out the applicable portion of section 402 of the Restatement (Third) and commented as follows:

The *Stepansky* court concluded that Florida could exercise jurisdiction "under the effects doctrine as long as the exercise of jurisdiction does not conflict with federal law and the exercise of jurisdiction is a reasonable application of the effects doctrine." In determining the latter, the court observed that Florida "has an interest in ensuring the protection of persons traveling to or from Florida by sea" and further that "Florida's tourism industry could be significantly affected if crimes that occur onboard cruise ships where a majority of the fare-paying passengers embark and disembark in Florida were to go unprosecuted." These interests plus the probability that the crime would go unpunished unless Florida acted made the exercise of Florida jurisdiction under the effects doctrine reasonable.[45]

The major difference between the present case and *Stepansky* is that in *Stepansky* there was a specific state jurisdictional statute authorizing the prosecution; in the present case—putting aside for the purposes of this part of the opinion AS 44.03.010(2)—there is not. In our view this difference is not dispositive.

Several recent cases have recognized that the application of the effects doctrine need not depend on the existence of a specific statute granting extraterritorial jurisdiction. Thus in *Rios v. State* the Wyoming Supreme Court applied the doctrine to a charge of interfering with child custody when neither the child nor the defendant-father had ever been in the state.[46] Treating the question as one involving subject matter jurisdiction, the court held that the prosecution was justified under the effects doctrine even though Wyoming did not have a statute permitting the exercise of extraterritorial jurisdiction: "While Wyoming does not have a specific statute which permits the exercise of juris-

diction when extraterritorial conduct causes a result in this state, the concept articulated in *Strassheim v. Daily* does not depend upon the existence of such a statute." [47] Since the mother of the child had become a resident of the State of Wyoming "the failure to return the child had its effect in the State of Wyoming" sufficient to justify application of the effects doctrine.[48] The court also questioned whether "there is any jurisdiction other than Wyoming which would have taken an interest in pursuing Rios' unlawful conduct." [49] In *In re Vasquez* the court recognized that the absence of a special jurisdictional statute was not necessarily a bar to state jurisdiction under the effects doctrine, observing that

> Oregon has no such statute, but it does not necessarily follow that the Oregon courts are disabled from relying on the rule of *Strassheim.* The *Strassheim* Court itself made no reference to the need for such a statutory provision, and at least one State court has held specifically that application of the effects doctrine is not dependent upon the existence of a jurisdictional statute explicitly providing for it.[50]

The same rule has been recognized in South Carolina, as well as in a leading text on criminal law: "As noted in *State v. Dudley,* 354 S.C. 514, 581 S.E.2d 171 (App.2003), though 'states have adopted the *Strassheim* doctrine by enacting a jurisdictional statute,' elsewhere 'the absence of a state jurisdictional statute is not dispositive.' " [51]

We agree with the authorities that have recognized that the effects doctrine can supply a stand-alone basis for the exercise of state extraterritorial jurisdiction. Further, AS 44.03.030(1) contemplates that extraterritorial jurisdiction may be exercised in the absence of a special statute so long as the exercise is based on established legal princi-

dent or domiciliary of the state. If the basis of jurisdiction is that the defendant is a state citizen or resident, the act must generally also have a significant effect within the State. *See id.* § 402 reporter's note 5.
*Stepansky,* 761 So.2d at 1035 n. 13 (alteration in original).

**45.** *Id.* at 1036–37.

**46.** 733 P.2d 242 (Wyo.1987).

**47.** *Id.* at 249 (citation omitted).

**48.** *Id.* at 250.

**49.** *Id.*

**50.** 428 Mass. 842, 705 N.E.2d 606, 611 (1999) (citing *Rios,* 733 P.2d at 244).

**51.** LaFave, *Substantive Criminal Law* (2d ed.2005) pocket part § 4.4(c) at 19.

ples.[52] As we noted earlier, this subsection implies that the state may exercise extraterritorial jurisdiction for any "reason recognized by law."[53] The breadth of this phrase suggests that case law as well as statutes are meant to serve as the basis for recognition of jurisdictional principles. Reading the 1959 act as a whole it seems apparent that the reference to "by law" in subsection .030(1) and the similar reference to the "rule of law" in section .040 are meant to be have a broader subject than just statutory provisions.

Because the effects doctrine is widely recognized by case law and legal commentators, it is a "reason recognized by law" within the meaning of AS 44.03.030(1). No other or more specific statute is needed to justify the exercise of state extraterritorial jurisdiction. But what is required is that the state must have a substantial interest so that the exercise of jurisdiction under the effects doctrine is reasonable.

This requirement is met under the circumstances of this case. The Alaska ferry route to the state of Washington is an important transportation link between the state and the contiguous forty-eight states. Most of the cities and towns in Southeastern Alaska served by this link lack any road access. Further, the ferries are important to the tourism industry. As the State puts it: "If people believe that crimes can be committed on ferries traveling to Alaska without any real risk of being prosecuted, it will have a harmful effect on Alaska's welfare—particularly on the personal security of ferry crew members and persons traveling to and from Alaska on ferries as well as on tourism and the economy." These interests are substantial and suffice to satisfy the application of the effects doctrine in this case. Further, the exercise of jurisdiction by Alaska is reasonable given the importance of the ferry system to the state and its people, and the lack of onboard public safety regulation by any other governmental authority.[54]

We conclude that under the effects doctrine Alaska has sufficient interests to justify the prosecution of the crime charged in this case and that the exercise of Alaska jurisdiction is reasonable.

## IV. CONCLUSION

For the above reasons we conclude that Alaska has jurisdiction over crimes committed on state ferries operating in Canadian waters. Two independent alternative grounds support jurisdiction: AS 44.03.010(2) and the effects doctrine. The decisions of the superior court and the court of appeals are REVERSED and this case is REMANDED to the superior court for further proceedings consistent with this opinion.

CARPENETI, Justice, concurs.

CARPENETI, J., concurring.

I agree that Alaska has jurisdiction to prosecute Jack, and that the decision of the court of appeals is therefore properly reversed. And I agree that Alaska's jurisdiction is found under AS 44.03.030(1) and the effects doctrine. But I would not base jurisdiction here, as today's opinion does, on the additional rationale that the crime occurred on the high seas and that Alaska therefore has jurisdiction under AS 44.03.010(2).

The term "high seas" has been variously interpreted by the courts, as today's opinion notes, but the modern cases have strongly tended towards interpreting the term to exclude the territorial waters of nations. "By ... 1920, the Supreme Court generally interpreted 'high seas' to mean international or non-sovereign waters."[1] In 1907, in *The Hamilton*,[2] Justice Holmes characterized the

---

52. *See supra* note 2.

53. *See supra* page 315.

54. Our conclusion mirrors that in *Stepansky* in which the court found that tourism was a legitimate state interest warranting jurisdiction over crimes occurring aboard cruise ships that traveled to and from Florida, noting that if onboard crimes were not prosecuted Florida's interests would suffer, and that it was unlikely that another jurisdiction would have a sufficient interest to prosecute. 761 So.2d at 1036.

1. *In re Air Crash Off Long Island, New York, on July 17, 1996,* 209 F.3d 200, 205–06 (2nd Cir. 2000) (citations omitted).

2. 207 U.S. 398, 28 S.Ct. 133, 52 L.Ed. 264 (1907).

"high seas" as "outside the territory, in a place belonging to no other sovereign."[3] In 1909, in *American Banana Co. v. United Fruit Co.,*[4] he referred to the "high seas" as a region "subject to no sovereign."[5] By 1920, when Congress adopted the Death on the High Seas Act (DOHSA),[6] it was clear that Congress understood the Supreme Court to have "interpreted 'high seas' to mean 'non-territorial waters.' "[7]

Under the Supreme Court's analysis in *McDermott* [*Int'l, Inc. v. Wilander* ][8] the consistent reliance on these decisions in setting the terms of the debate over DOHSA strongly suggests that Congress understood "high seas" to mean what these cases said it did, that is, international waters.[9]

In the years following the adoption of DOHSA in 1920, "[t]he Supreme Court continued to define 'high seas' as 'international waters.' "[10] In 1923, in *Cunard Steamship Co. v. Mellon,*[11] the question concerned the reach of the National Prohibition Act, which was enacted pursuant to the Eighteenth Amendment. The latter governed conduct within "the United States and all territory subject to the jurisdiction thereof."[12] The Court noted that the Act had no effect outside the territorial waters of the United States.[13] "The Court rejected the argument that. the Prohibition Amendment covered ships 'outside the waters of the United States, whether on the high seas or in foreign waters,' because 'on the high seas ... there is no territorial sovereign.' "[14]

The ferry Matanuska was in Canadian territorial waters, in the Inside Passage, when the events in question allegedly occurred. Because the territorial waters of Canada do not appear to be the "high seas," I would not

base the state's jurisdiction on AS 44.03.010(2).

---

**3.** *Id.* at 403, 28 S.Ct. 133.

**4.** 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909).

**5.** *Id.* at 355, 29 S.Ct. 511.

**6.** 46 U.S.C.A. app. §§ 761–67 (2005).

**7.** *In re Air Crash,* 209 F.3d at 206.

**8.** 498 U.S. 337, 341–42, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991).

**9.** *In re Air Crash,* 209 F.3d at 206.

**10.** *Id.*

**11.** 262 U.S. 100, 43 S.Ct. 504, 67 L.Ed. 894 (1923).

**12.** U.S. Const amend. XVIII, § 1.

**13.** *Cunard,* 262 U.S. at 123, 43 S.Ct. 504.

**14.** *In re Air Crash,* 209 F.3d at 206 (quoting *Cunard,* 262 U.S. at 123, 43 S.Ct. 504).